

FILED by __ D.C.

ELECTRONIC

**June 02, 2008**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO.:

TRIGEANT, LTD.
and TRIGEANT EP LTD.,

## 08-80584-Civ-MIDDLEBROOKS/JOHNSON

     Plaintiffs,

v.

PETROLEOS DE
VENEZUELA, S.A.,

     Defendant.

_____/

## <u>NOTICE OF REMOVAL</u>

Defendant PETROLEOS DE VENEZUELA, S.A. ("PDVSA"), pursuant to 28 U.S.C.

§§ 1441, 1446 and 1602 *et seq.*, and through its undersigned counsel, hereby removes this action

from the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida, to

the United States District Court for the Southern District of Florida, West Palm Beach Division,

being the district and division within which the action is pending, and states:

     1.    On March 27, 2008, plaintiffs Trigeant Ltd. and Trigeant EP Ltd. ("Trigeant" or

"Plaintiffs") filed a First Amended Complaint in the Circuit Court of the Fifteenth Judicial

Circuit in and for Palm Beach County, Florida. The First Amended Complaint is entitled

*TRIGEANT, LTD. and TRIGEANT EP LTD., Plaintiffs, v PETROLEOS DE VENEZUELA, S.A.,*

*Defendant*, and it is designated as Case No. 502008CA007360XXXXMBAI.

     2.    PDVSA has not been served with any process, pleadings or orders in this action.

On March 27, 2008, Trigeant delivered a courtesy copy of its First Amended Complaint to

PDVSA with a request for waiver of service.  PDVSA does not waive service.  A copy of the First Amended Complaint, with exhibits, is attached as Exhibit "A" hereto.  Copies of the original Complaint, attached as Exhibit "B" hereto, and motions and orders for admission *pro hac vice* filed by Trigeant's Houston, Texas counsel, attached *in globo* as Exhibit "C" hereto, have also been delivered but not served.

3.    This is a civil action in which Plaintiffs assert causes of action for alleged anticompetitive conduct and/or trade practices under Florida and/or Venezuelan Law.  This Court has original jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1602, *et seq.*, because this is a civil action involving an agency or instrumentality of a foreign state as defined in § 1603(b) of the Foreign Sovereign Immunities Act ("FSIA").

4.    Defendant PDVSA is a Venezuelan corporation with its principal place of business in Caracas, Bolivarian Republic of Venezuela, and is an agency or instrumentality of a foreign state as defined in FISA, 28 U.S.C. §§ 1602, *et seq.*

5.    Upon information and belief, Plaintiffs are Florida Limited Partnerships with their principal places of business in Palm Beach County, Florida. *See* First Amended Complaint, ¶¶ 4-5.

6.    Pursuant to 28 U.S.C. §§ 1441(a), (b) and (d), this case is properly removable to the United States District Court for the Southern District of Florida, West Palm Beach Division.

7.    This Notice of Removal is being filed prior to Plaintiffs effecting proper service of the First Amended Complaint upon PDVSA, and therefore complies with the requirements of 28 U.S.C. § 1446(b).

8.     Promptly after filing this Notice of Removal, PDVSA shall give written notice thereof to Plaintiffs pursuant to 28 U.S.C. § 1446(d).

9.     Promptly after filing this Notice of Removal, PDVSA shall cause a true and correct copy to be filed with the Clerk of Court in the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida, pursuant to 28 U.S.C. § 1446(d).

10.    PDVSA expressly reserves all rights, claims and defenses, including, without limitation, on grounds of insufficient service of process, lack of personal jurisdiction, and the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602, *et seq.*

11.    Nothing in this Notice of Removal shall be deemed a waiver of immunity or of any jurisdictional or other defense, and by giving notice of the removal of this action, PDVSA does not waive any rights, claims or defenses.

WHEREFORE, PDVSA removes this action from the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida, to the United States District Court for the Southern District of Florida, West Palm Beach Division.

Respectfully submitted,

**OF COUNSEL:**

Christopher O. Davis
Baker Donelson, Bearman, Caldwell
    & Berkowitz
201 St. Charles Avenue
Suite 3600
New Orleans, LA 70170
Telephone:504-566-5200
Telecopier: 504-636-4000

By:_____
      Maxine M. Long
      Florida Bar No. 286842
      *email: mlong@shutts.com*
      **SHUTTS & BOWEN LLP**
      1500 Miami Center
      201 South Biscayne Boulevard
      Miami, Florida 33131
      (305) 358-6300
      (305) 381-9982 (facsimile)
      Attorneys for Defendant
      PETROLEOS DE VENEZUELA,
      S.A.

## CERTIFICATE OF SERVICE

I certify that the foregoing document is being served this $2\ell$ day of June, 2008 on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

Maxine M. Long

**<u>SERVICE LIST</u>**
**TRIGEANT, LTD.and TRIGEANT EP LTD.**
**V. PETROLEOS DE VENEZUELA, S.A.,**

David Atkinson, Esq.
Florida Bar No. 767239
*datkinson@gunster.com*
Aaron Tandy, Esq.
Florida Bar No. 190144
*atandy@gunster.com*
Revecca Cavendish, Esq.
Florida Bar No. 152153
*rcavendish@gunster.com*
Gunster Yoakley & Stewart  PA
777 South Flagler Drive, Suite 500 East
West Palm Beach, FL 33401

Maxine M. Long

MIADOCS 2789257 2

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

TRIGEANT LTD.
and TRIGEANT EP LTD.,

      Plaintiffs,

v.

PETROLEOS DE
VENEZUELA, S.A.,

      Defendant.

/

Case No. 502008CA007360XXXXMBAI

COPY
RECEIVED FOR FILING

MAR 2 7 2008

SHARON R. BOCK
CLERK & COMPTROLLER
CIRCUIT CIVIL DIVISION

## FIRST AMENDED COMPLAINT

Plaintiffs TRIGEANT LTD. and TRIGEANT EP LTD. (together "Trigeant"), by and through the undersigned counsel, file this Complaint against PETROLEOS DE VENEZUELA, S.A. ("PDVSA") and respectfully state:

### I.   NATURE OF THIS ACTION

1.   This is an action brought pursuant to § 542.19 of the Florida Statutes, for treble damages resulting from the anticompetitive conduct of defendant PDVSA in respect of the Wholesale Market[1] and Retail Market[2] for Florida-spec asphalt[3] in the State of Florida.

2.   Additionally, the Complaint is brought pursuant to § 501.201 et seq., known as the Florida Deceptive and Unfair Trade Practices Act, for damages resulting from PDVSA's unfair, unconscionable, and anti-competitive trade practices in the Wholesale Market and Retail Market for Florida-spec asphalt in the State of Florida.

---

[1] Defined below at Para. 12.
[2] Defined below at Para. 13.
[3] Defined below at Para. 10.

GUNSTER, YOAKLEY & STEWART, P.A.
A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW

MIAMI 456031.1

**Exhibit "A"**

3.      Finally, this Complaint is brought pursuant to Article 1.185 of the Venezuelan Civil Code as allowed by Article 32 of the Venezuelan Act on Private International Law, for damages resulting from the unlawful acts committed by PDVSA's top management at its offices in Caracas, Venezuela during negotiations in which PDVSA either intentionally, negligently, or imprudently exceeded the limits of good faith established in paragraph 2 of Article 1.185 of Venezuelan Civil Code in accordance with Article 12 of the Venezuela Code of Civil Procedure and entrenched jurisprudence in inducing Trigeant EP Ltd. to purchase the refinery in Chickasaw, Alabama and related distribution assets in March 2003 by promising a supply of Boscan that PDVSA ultimately did not provide. [4]

## II.     THE PARTIES, JURISDICTION, AND VENUE

4.      Trigeant Ltd. is a Florida Limited Partnership with its principal place of business in Palm Beach County, Florida.

5.      Trigeant EP Ltd. is a Florida Limited Partnership with its principal place of business in Palm Beach County, Florida.

6.      PDVSA is a Venezuelan state-owned corporation that is in the business of producing, supplying and selling crude oil and other petroleum products around the world, including into and within the State of Florida. During the relevant period, PDVSA completely controlled the actions of its U.S. agents and subsidiaries, Citgo Petroleum Corporation ("Citgo") and Citgo Asphalt Refining Company ("Carco"). Through these agents and subsidiaries, and by its own actions, PDVSA is active in the paving asphalt market along the entire U.S. Atlantic coast, including the State of Florida.

---

[4] Plaintiffs request the Court take judicial notice pursuant to Florida Rules of Evidence Rule 90.202(4) of the law of Venezuela.

GUNSTER, YOAKLEY & STEWART, P.A.
A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW
PAGE 2

7.   Citgo refines and markets petroleum products within the State of Florida. Carco, which is owned by Citgo, is known as the largest asphalt refiner on the U.S. East Coast, and also conducts substantial business within the State of Florida.

8.   This action seeks damages exceeding $15,000, exclusive of interest, costs and attorneys' fees, arising out of Defendant's unlawful conduct committed against Trigeant, as well as special damages set forth below.

9.   Jurisdiction and venue are properly laid in this court because Defendant PDVSA transacts business in Palm Beach County, Florida and certain of the unlawful acts and violations described in this Complaint occurred and damages were sustained in Palm Beach County, as they have been and were in part conceived, carried out, and made effective within Palm Beach County, Florida and elsewhere.

## III.   RELEVANT MARKETS

10.   The relevant product market is paving asphalt that meets the specifications for state highway construction imposed by the State of Florida's Department of Transportation ("Florida-spec asphalt"). The relevant product market identified in this Paragraph applies to both categories of geographic market set out in Paragraph 12 through Paragraph 14 of this Complaint.

11.   There is little-to-no cross elasticity of demand between paving asphalt and other substitute products, as there is effectively no alternative product to Florida-spec paving asphalt for consumers in the State of Florida. This is because the properties of paving asphalt vary significantly from those of roofing asphalt, concrete, paving stones, bricks, and so forth. Further, the nature of the specifications imposed by the state is such that it is not possible to commingle Florida-spec and other asphalt without corrupting the

GUNSTER, YOAKLEY & STEWART, P.A.
A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW
PAGE 3

MIAMI 456031.1

8 of 145

Florida-spec asphalt. Even the residue from a tank which previously held non Florida-spec asphalt can prevent later stored Florida-spec asphalt from meeting Florida Department of Transportation specifications. Coupled together, the high demand for asphalt in state-sponsored projects and the practical and economic difficulties in maintaining stocks of both Florida-spec and non-spec asphalt effectively dictate that only Florida-spec asphalt is sold in Florida.

12.     There are two categories of relevant geographic market in this case. They correspond to the two levels of the paving asphalt market in which Trigeant was engaged. The first geographic market is the State of Florida, in which Trigeant competed with PDVSA and another company as a refiner, importer and supplier of Florida-spec asphalt to businesses that in turn sold this product to end users (the "Wholesale Market"). Purchasers on the Wholesale Market (who ultimately sell to end users) buy asphalt directly from asphalt refiners such as PDVSA, Citgo/Carco, and Trigeant, and store the asphalt in facilities called "asphalt terminals." As explained in further detail below, the Wholesale Market for asphalt in Florida is defined in large part by regulations imposed by the State of Florida on the kind and quality of asphalt that can be used in state-sponsored projects.

13.     The second geographic "market" –which is in fact a group of markets– relates to Trigeant's competition with PDVSA and certain other companies as a distributor of finished Florida-spec asphalt to end users (the "Retail Market"). As explained above, Retail Market distributors of Florida-spec asphalt buy the asphalt from asphalt wholesalers who refine the product, and store it for distribution in asphalt terminals. The relevant geographic market for this action at the retail level in fact consists of two of the

GUNSTER, YOAKLEY & STEWART, P.A.
A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW
PAGE 4

MIAMI 456031.1

9 of 145

five asphalt distribution regions within the State of Florida. Each of these regions can be identified by the locations of various asphalt terminal clusters owned by asphalt retailers. These clusters tend to be located in or around major urban centers, and in turn service end users in conjunction with numerous "hot-mix plants." Hot-mix plants are industrial facilities that process orders from the end users of Florida-spec asphalt at the Retail Market level, and specialize in heating finished liquid asphalt and mixing in the desired amount of aggregate (usually crushed stone or other small solids). This is done in preparation for application of the asphalt at the final jobsite by those end users. The geographic boundaries and extent of each region at the retail level can be identified by matching each hot-mix plant with a respective terminal cluster. Because the cost of transporting asphalt is substantial, and rises quickly over increasing distances given the need to keep it at a high temperature, end users typically send purchased asphalt to the hot-mix plants geographically closest to the terminal supplying the liquid asphalt. Thus, in conducting a straight-line distance analysis to determine the closest terminal cluster to each individual hot-mix plant in the State of Florida, it is possible to obtain an accurate picture of the boundaries of each of the five geographic regions at the retail level. The location of significant asphalt terminal clusters and an estimate of the geographic areas they service as marked by hot-mix plants are attached to this Complaint at **Exhibit 1.** Altogether, Florida's five asphalt retail regions include: Pensacola, Jacksonville, Tampa, Cape Canaveral, and Ft. Lauderdale. On information and belief, while the retail price for Florida-spec asphalt generally moves in trends that can be identified on a statewide level, with Tampa and Jacksonville oftentimes leading, there are sustained price differences

GUNSTER, YOAKLEY & STEWART, P.A.
A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW
PAGE 5

MIAMI 456031.1

10 of 145

among regions over long periods of time along with independent price fluctuations for this product in each of these individual regional markets.

14.   Tampa and Jacksonville are the most important of the five identifiable regions, due to their central geographic placement within the state and the significant volume of asphalt sold from these locations. Consequently, PDVSA with its substantial presence through Citgo/Carco's ownership of asphalt terminals in each of these two markets (Tampa and Jacksonville) was able to exert control over prices and affect consumers across Florida in each of the other three regional markets (Pensacola, Cape Canaveral, and Ft. Lauderdale). Nonetheless, given that PDVSA focused its bad acts at the retail level for Florida-spec asphalt in Tampa and Jacksonville, uniquely for the purposes of alleging monopolization and attempted monopolization under Fla. Stat. § 542.19, Trigeant limits its geographic market allegations at the retail level to include only the Tampa and Jacksonville regions.

A.   **Market Background**

15.   Paving asphalt is a petroleum-based material used primarily for the paving of roads. Paving asphalt is generally a firmer, lower-penetration material than other types of asphalt, such as roofing asphalt, and is valued for its durability and relative low cost compared with other paving materials.

16.   Paving asphalt is refined from crude oil, and is in fact a blend of various heavy hydrocarbons with certain thermoplastic characteristics which make them uniquely resistant and durable. Notably, not all crude oils produce asphalt. Thus, in order to participate in the Wholesale Market for paving asphalt, a seller must obtain a steady supply of crude oil from which paving asphalt can be refined.

GUNSTER, YOAKLEY & STEWART, P.A.
A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW
PAGE 6

MIAMI 456031.1

11 of 145

17.    Crude oils are classified by their density.  Generally, they are divided into light, medium, heavy, and extra-heavy crude oils.  A crude oil that is "light crude oil" is one whose blend is predominately low density hydrocarbons.  On the other hand, a "heavy crude oil" is unique in that hydrocarbons are present at a higher density. Refineries are configured to process a specific type of crude oil.  However, a refinery designed to process one type of crude oil, such as one form of light crude oil, is typically not used to process another type of crude oil, such as a variety of heavy crude oil.

18.    After the heavy crude is refined into paving asphalt, it is then transported to storage facilities and distribution centers, known as asphalt terminals, before being sold on the Retail Market or to end users, as shown in the following graph:



19.    Paving asphalt is refined most effectively from dense, heavy crude oils, whereas gasoline, kerosene, and other such petroleum products are derived from "light ends," the less-dense hydrocarbons in the crude oil.  Accordingly, asphalt refineries are configured differently from those which refine lighter petroleum products.  Thus, a refinery built to produce asphalt cannot easily or cost-effectively be converted to produce other petroleum products like gasoline.

20.     There are a number of heavy crude oils which are commonly marketed for use as feedstock in asphalt refining.   These crude oils are called "asphaltic crudes." Primarily, this includes crude oils such as Topped Maya (a Mexican crude which has been partially processed to remove some of the light ends), Altamira (also from Mexico), Coban (a blended crude from Guatemala) and Boscan.   Boscan crude, a product of Venezuela, is particularly desirable as asphalt feedstock for a number of reasons.  First, it contains a lower percentage of light ends and so yields a higher quantity of asphalt when processed.  This advantage is demonstrated in the graph below:



GUNSTER, YOAKLEY & STEWART, P.A.
A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW
PAGE 8

MIAMI 456031.1

13 of 145

*See* Ludo Zanzotto, *Paving Asphalts: Origins, Properties, Manufacture, and Use*, *available at* http://whatiscivilengineering.csce.ca/PowerPoint/ZanzottoAsphalt.ppt (May 2001).

Second, Boscan is also relatively less acidic and is lower in sulfur and salt content compared to other asphaltic crude oils, which reduces its corrosive effect and allows for more economical refining. Finally, using Boscan as a feedstock yields a higher quality asphalt. In particular, it consistently produces asphalt that will meet the standards for paving asphalt imposed by Florida's Department of Transportation.

21.     As noted above, Boscan is a product of Venezuela. Indeed, the only oil fields in the world that can produce Boscan are located there. While production of oil from Venezuelan fields has in the past been contracted out to a private oil company, PDVSA, as the state oil company of Venezuela, has the sole right to sell Boscan on the world market.

22.     The cost of entry into the wholesale paving asphalt refining market is very high, as a typical refinery can cost millions of dollars to start up and maintain. As previously stated, because of differences in the chemical make-up of the various feedstocks, asphalt refineries are usually designed to process only one specific variety of crude oil without complications. Reconfiguring a refinery to process a different feedstock can require several million dollars in construction and downtime costs. Given the narrow margins on which most refiners operate, such conversions are essentially cost prohibitive.

23.     Similarly, storing and transporting finished asphalt poses significant economic restrictions. The product must be kept at a specific temperature (approximately 275 degrees Fahrenheit) at all times to ensure it will retain its chemical characteristics and

GUNSTER, YOAKLEY & STEWART, P.A.
A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW
PAGE 9

MIAMI 456031.1

14 of 145

remain in a liquid state.  This requires the use of specially designed trucks, barges and vessels which are generally more expensive to operate than their non-asphalt counterparts, given the need to maintain a constant high temperature.  Static storage of asphalt is done in large, heated tanks.  These tanks retain residue from the product stored in them when emptied.  Therefore, if a particular grade of asphalt in a tank is removed and replaced with a different grade, the residue from the first will alter the chemical composition of the second batch, typically resulting in the second batch no longer meeting the standards set for its grade.  Because there is insufficient storage capacity to justify maintaining separate storage systems for Florida-spec and non-Florida-spec paving asphalt, producers and distributors of asphalt in Florida stock only product that qualifies as Florida-spec.

24.     Participants engaged in the business of selling asphalt to end users operate distribution terminals which require a significant investment of money to lease or build the transportation and storage infrastructure described above.  Depending on how the finished asphalt is to be delivered to the terminal, there may be additional expenses for the construction and maintenance of docks or rail yards.  There are also significant regulatory and environmental hurdles which must be overcome before any new facility can be built.  Similarly, there are substantial licensing and insurance costs associated with the operation of such distribution centers.  Thus, the typical distribution center can cost several million dollars to build and maintain annually.

25.     Although multiple grades of paving asphalt are manufactured and used throughout the United States, as mentioned above, the State of Florida imposes detailed specifications for all paving asphalt to be used in highway projects within the state.  The

GUNSTER, YOAKLEY & STEWART, P.A.
A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW
PAGE 10

MIAMI 456031.1

15 of 145

specifications imposed by Florida's Department of Transportation for asphalt pavement are shown in the attached **Exhibit 2**. Because of the state-imposed specifications, no other type of asphalt can be substituted legally for Florida-spec asphalt in public roadway projects within the state.

26.    In order to consistently produce asphalt which will meet the State of Florida's specifications, a refiner must use a feedstock with certain properties. Of the heavy crudes listed above, only Boscan and Altamira consistently meet this standard. Processed by itself, Topped Maya will not yield Florida-spec asphalt, although it can if blended with small amounts with Boscan. Coban can occasionally produce Florida-spec asphalt, but because of inconsistencies in the way it is blended by its producer, it cannot do so reliably. Again, this can be solved by blending with Boscan.

27.    Between Boscan and Altamira, the preferable feedstock for producing Florida-spec asphalt is Boscan. Altamira has a much higher salt content and is therefore far more corrosive, which increases maintenance costs and refining time. Altamira was not used in any significant way in those refineries which supplied Florida-spec asphalt to the Florida market during the relevant period.

**B.      Competition in the Relevant Markets**

28.    Before PDVSA drove Trigeant out of the market, Trigeant was in the business of refining and selling Florida-spec paving asphalt throughout the State of Florida and along the east coast of the United States. By the spring of 2003, Trigeant owned and operated refineries serving the Florida market in Corpus Christi, Texas and Chickasaw, Alabama. Trigeant Ltd. had owned and operated the Corpus Christi refinery since June 29, 2001 while Trigeant EP Ltd. purchased the refinery in Chickasaw and related

GUNSTER, YOAKLEY & STEWART, P.A.
A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW
PAGE 11

MIAMI 456031.1

16 of 145

distribution assets in March 2003.  Trigeant EP Ltd. also leased or owned terminals throughout Florida and along the east coast as far north as Boston, Massachusetts. These were obtained at the same time the Chickasaw refinery was purchased.

29.     Both refineries were designed to process Boscan crude oil into paving asphalt. The grade of product they produced when running Boscan met the standards necessary to be deemed Florida-spec asphalt.  The asphalt produced at these facilities was then used to supply Trigeant's wholesale and retail infrastructure which included Florida, Texas, Alabama and other parts of the Atlantic and southeastern United States.  In Florida, various terminal facilities were owned or leased by Trigeant EP Ltd., allowing the company to operate at both the Wholesale Market and Retail Market levels, with asphalt terminal locations in Jacksonville, Cape Canaveral, Tampa, Pensacola, Fort Lauderdale/Port Everglades, and West Palm Beach (not leased by Trigeant until approximately 2005).  See Exhibit 1.

30.     Until it was driven from the market, Trigeant was one of effectively three refiners of Florida-spec asphalt serving the Southeastern United States.  Between 2003 and 2004, 90% of the asphalt sold in that region was produced between these three refiners.  The other two competitors were:  (1) PDVSA, through Carco, which is wholly owned by PDVSA's wholly owned U.S. subsidiary, Citgo; and (2) Marathon Oil Company ("Marathon").

31.     Citgo and Carco, as PDVSA's agents and subsidiaries, are largely dependant upon PDVSA for a substantial portion of the asphalt they sell.  In 2001, PDVSA provided 19% of the total asphalt sold by Carco.  This percentage increased over time and by 2005 PDVSA was supplying Carco with 28% of the asphalt it sold.  Citgo and Carco are also

GUNSTER, YOAKLEY & STEWART, P.A.
A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW
PAGE 12

MIAMI 456031.1

17 of 145

entirely dependent upon PDVSA for the crude used in their U.S. refineries to produce finished asphalt. PDVSA crudes made up 88% of the total feedstock used by Citgo and Carco from 2002 to 2006. For Carco's Savannah, Georgia refinery, which services the Florida market, Boscan crude supplied by PDVSA makes up 100% of the feedstock.

32.    Upon information and belief, PDVSA and its U.S. subsidiaries and agents (Citgo and Carco) produce approximately 54% of all asphalt used in the Petroleum Administration for Defense District I ("PADD I") as established by federal mandate. PADD I extends from Maine to Florida and covers northeast, mid-Atlantic and southeastern U.S. A map of PADD I is attached hereto as **Exhibit 3**.

33.    Furthermore, upon information and belief, when narrowing the scope only to account for PDVSA's market share for the sale of Florida-spec asphalt within the Florida Wholesale Market and Florida Retail Market alone during the period of alleged bad acts, it is believed that PDVSA's retained a clear majority of market share such that PDVSA possessed monopoly power and/or a dangerous probability of acquiring such monopoly power. On the wholesale side, the only other competition PDVSA had during the relevant period, apart from Trigeant, was Marathon. During the alleged period of bad acts by PDVSA and its agents subsidiaries, Marathon sold a smaller volume of paving asphalt than PDVSA and its agents/subsidiaries because Marathon's asphalt was but a mere byproduct of its primary operation, the refining of lighter petroleum products such as gasoline. Upon information and belief, Marathon's asphalt was and is simply the less-desirable result of separated "heavy-ends" from the lighter oil that Marathon refines for other purposes, and such asphalt is sold simply so that it does not go to waste. Because its primary business was and is the production of gasoline, Marathon typically sold its

GUNSTER, YOAKLEY & STEWART, P.A.
A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW
PAGE 13

MIAMI 456031.1

18 of 145

paving asphalt at the price set by PDVSA, making it a "price taker." Thus, PDVSA's large production volumes, the extreme concentration of the Wholesale Market, and the price-taking nature one of the participants demonstrates that PDVSA maintained significant, if not overwhelming, market power in the Wholesale Market during the relevant period of bad acts.

34.    Upon information and belief, PDVSA also has a clear majority of market share in the Retail Markets of Tampa and Jacksonville. While there are more than three participants at this level, PDVSA's control of high volumes of Florida-spec asphalt coupled with its ownership of terminals in these key regional markets of Tampa and Jacksonville gave PDVSA the ability not only to control retail prices in these two markets, but to also affect prices throughout the state.

35.    PDVSA through Citgo/Carco exercised additional market power at both the wholesale and retail levels above and beyond what would typically be reflected in its market share due, in part, to the fact that it unilaterally determined the price at which all supplies of Boscan crude were sold to participants in the Wholesale Market. In setting the price for the main input for the creation of Florida-spec asphalt, PDVSA was able to exercise a disproportionately large impact on the price of asphalt sold at both the wholesale level, and at the retail level in Tampa and Jacksonville.

C.        **PDVSA's Assault on the Free Market**

36.    As Venezuela's state-owned oil company, PDVSA has held a monopoly over the supply of Boscan crude oil since the fields from which the oil originates were nationalized by the Venezuelan government in the mid 1970's. Nevertheless, PDVSA promised to provide Boscan to Trigeant at a fair market price in part through a long-term

GUNSTER, YOAKLEY & STEWART, P.A.
A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW
PAGE 14

MIAMI 456031.1

19 of 145

supply agreement executed in December 2002 (the "Supply Agreement"). However, around the same time, there began a two-month political uprising, including a general strike of PDVSA's employees, within Venezuela. Previously, PDVSA was directly involved in supplying the Florida market with asphalt side-by-side with Citgo and Carco (although to a more limited extent). Beginning in this time of Venezuelan domestic upheaval, PDVSA decided to deal in the Florida market (and greater U.S. market) exclusively through its subsidiaries, Citgo and Carco. This arrangement was formalized on or about February 24, 2003 with the execution of an agreement that made Citgo PDVSA's sole representative and agent for the marketing of, among other things, crude oil and finished asphalt in the U.S. market. PDVSA also declared *force majeure* under the Supply Agreement with Trigeant. It was not long after that point when PDVSA, acting through its subsidiaries and agents, Citgo and Carco, engaged on a new course aimed at squeezing out Carco's competitors in parts of the United States, including Florida.

37.     Within a few months after the *force majeure* period under the Supply Agreement had ceased, PDVSA began refusing to sell Boscan or finished asphalt to Trigeant, thereby ensuring the elimination of Carco's primary competitor in the relevant markets. Struggling to keep its refineries open after suffering such an enormous blow, Trigeant looked for alternate suppliers of Boscan who would deal at an economically feasible price. Such efforts were to no avail because PDVSA had informed crude traders that handled Boscan contracts of its refusal to deal with Trigeant and encouraged such sellers—who necessarily obtained their crude from PDVSA—to charge Trigeant an unreasonable price, if they were to deal with Trigeant at all. PDVSA continued this

GUNSTER, YOAKLEY & STEWART, P.A.
A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW
PAGE 15

Boscan embargo against Trigeant, with only a brief respite in January and February 2005, when PDVSA allowed Trigeant to received two Boscan cargoes via an intermediary company (Interpetrol). PDVSA then reassumed its objectionable conduct, and Trigeant was eventually forced to exit the Wholesale and Retail Markets for Florida-spec asphalt, with Trigeant EP Ltd. stopping operations in March 2005 and Trigeant Ltd. halting operations on March 4, 2008.

38.     Deprived of Boscan, with a brief respite from PDVSA's harmful and illegal conduct in January and February 2005, Trigeant made several efforts to refine alternative heavy crudes, such as Coban and Altamira, at its paving asphalt plants.  Such attempts, however, were unsuccessful.  Because neither refinery was designed to run the substitute crudes, significant additional maintenance and downtime costs were incurred.  In some cases, for instance when Altamira was used, expensive equipment was ruined.  In others, the end product failed to meet the standard necessary to allow sale into the Florida market.   After trying several different types of crudes, Trigeant was unable to consistently produce Florida-spec asphalt without causing severe damage to its facilities.

39.     It would have cost Trigeant several million dollars to convert its asphalt refineries to process non-Boscan heavy crude.  Even if Trigeant could have afforded such conversion, it would have been wholly uneconomic to do so because PDVSA had kept the prices for paving asphalt artificially low by over-supplying the relevant market through its agents/subsidiaries Citgo and Carco, such that Trigeant likely would not have recovered its costs.

40.     Upon information and belief, PDVSA's agents/subsidiaries (Citgo and Carco) were able to absorb the below-market prices because PDVSA either set the transfer price

GUNSTER, YOAKLEY & STEWART, P.A.
A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW
PAGE 16

MIAMI 456031.1

21 of 145

for the Boscan sold to them below PDVSA's costs or because PDVSA simply allowed its subsidiaries to incur significant losses. Again, PDVSA appears at the very least to have engaged in this continuing pattern of below-cost sales on a consistent basis until Trigeant EP Ltd. was finally forced to exit the Wholesale and Retail Markets for Florida-spec asphalt in March 2005.

41.    As the consequence of PDVSA's anti-competitive actions, Trigeant EP Ltd. ultimately sold off its Chickasaw refinery and associated distribution network to Tripso, LLC ("Tripso") in an agreement dated as of March 1, 2005, thus exiting the relevant market for Florida-spec paving asphalt altogether. The Corpus Christi refinery was able remain in marginal operation between the time PDVSA cut off Trigeant's Boscan supply and March 2008 by serving markets other than Florida. However, deprived of one of the major markets it originally served, the refinery became less and less profitable while attempts to process other forms of crude failed, given the refinery's optimization to process Boscan. Finally, in a devastating blow fully stemming from PDVSA's illegal acts which forced it out of business, Trigeant Ltd. lost its Corpus Christi refinery to its creditors on March 4, 2008. Through similar anticompetitive tactics, PDVSA later succeeded in driving out Tripso, the successor entity to Trigeant EP Ltd. that took over the Chickasaw refinery. At present, these assets remain owned by Tripso's creditor, Sowood Capital who has mothballed the Chickasaw refinery.

42.    Having now been entirely excluded from the relevant markets, Trigeant brings this suit to recover from the severe financial damage caused by PDVSA's anticompetitive tactics.

GUNSTER, YOAKLEY & STEWART, P.A.
A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW
PAGE 17

MIAMI 456031.1

22 of 145

IV.   **PDVSA'S IMPROPER CONDUCT COMMITTED IN FURTHERANCE OF ITS ATTEMPTS TO MONOPOLIZE, OR ALTERNATIVELY, IN ABUSE OF ITS MONOPOLY POWER**

43.   PDVSA, leveraging its sole control over the production and sale of Boscan crude and its control over a clear majority of the Wholesale Market for the production and sale of Florida-spec asphalt, along with the Retail Markets of Tampa and Jacksonville, has taken additional wrongful and illegal steps to force Trigeant from both the alleged Wholesale and Retail Markets. This amounts to either an abuse of monopoly power or a blatant attempt to obtain such power. In doing so, PDVSA has engaged in the following anticompetitive conduct:

A.   **Refusal to deal**

44.   PDVSA strung Trigeant along with continual refusals to sell Boscan commingled with occasional breaths of air in the form of spot cargoes. PDVSA engaged in four specific acts in which it demonstrated its refusal to deal with Trigeant. First, PDVSA cancelled the Supply Agreement for Boscan crude oil, which was supposed to run from December 1, 2002 to November 30, 2003. Second, PDVSA continually and repeatedly refused to sell commercially useful cargoes of Boscan to Trigeant. Third, PDVSA compounded this situation by notifying third-party oil traders to prevent any spot sales of Boscan to Trigeant. Fourth, PDVSA informed producers of substitute heavy crudes, like Topped Maya, that they could charge a higher price to Trigeant because it could not count on any supply from PDVSA. However, Trigeant tried diligently to negotiate with PDVSA for the sale of Boscan. And, in early 2005, Trigeant's efforts proved successful in that PDVSA relented and notified third-party oil traders that certain spot sales of Boscan could be made to Trigeant. In January and February 2005, Trigeant

GUNSTER, YOAKLEY & STEWART, P.A.<br>
A PROFESSIONAL ASSOCIATION<br>
ATTORNEYS AT LAW<br>
PAGE 18

received two Boscan cargoes via an intermediary company (Interpetrol). However, those were the last Boscan cargoes received and thereafter PDVSA continually and repeatedly refused to sell any other commercially useful cargoes of Boscan to Trigeant up to the present day. Further, from early 2005 to the present day, no third party will supply Trigeant with any spot cargoes of Boscan.

45.    Boscan is often priced by reference to the posted prices of another type of heavy crude oil, Maya, which is produced in Mexico. Boscan always trades at a discount to Maya for three reasons: (i) first, Maya is a lighter crude oil than Boscan and produces a larger percentage of light-ends than Boscan, (ii) second, there are higher shipping costs associated with Boscan because it travels farther than Maya (Maya is picked up near Tampico, Mexico, a one day voyage to the Gulf Coast of the United States, whereas Boscan is a five day voyage), and (iii) third, Boscan is less efficient to ship because it requires the maintenance of a higher heat in the transporting vessel than does Maya, the delivery port has less efficient draft requirements for vessels, and there are greater costs to load Boscan than Maya.

46.    Except for those instances noted above, PDVSA has continually and repeatedly refused to sell Trigeant Boscan at a price quoted at a discount from Maya. As a result, PDVSA's pricing has failed to reflect the typical market relationship between the two heavy crudes. On information and belief, it is understood that PDVSA has both made and continues to make sales of Boscan to other purchasers at prices which represent a discount from the then-prevailing price of Maya. Similarly, all attempts to purchase finished Florida-spec asphalt from PDVSA have met with either refusals to deal or with demands for uneconomic purchase prices.

GUNSTER, YOAKLEY & STEWART, P.A.
A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW
PAGE 19

47.     As noted above, Trigeant attempted to use other heavy crudes to make up for the lack of Boscan but none were economically feasible. Coban blend, a combination of Xan and Coban (two Guatemalan crude oils), would yield Florida-spec asphalt occasionally, but inconsistencies in the producer's blend meant Trigeant could never be sure if it would. Also problematic was Coban's hydrogen sulfide content. In fact, the content was so high that it was inherently corrosive and caused significant damage to the refinery.     To continue running Coban would be uneconomic due to increased maintenance expenses and downtime.

48.     Unlike Coban, a Mexican crude called Altamira was found to consistently produce Florida-spec Asphalt. However, it too had a high salt content and was so heavy that it ruined the heat exchangers in the Chickasaw refinery. In order to run Altamira successfully, it would take a refit of the entire refinery at a multi-million dollar cost that Trigeant could never have recovered. Simply running it through the refinery as it is currently configured would have resulted in additional expenses ranging from US$50,000 to US$100,000 for each cargo processed, in addition to requiring frequent shut downs of the facility.

49.     Continually and repeatedly deprived of its ability to produce the inventory needed to supply its terminals from its own refinery and refused the ability to buy finished asphalt from PDVSA, one of only two other producers making Florida-spec asphalt, Trigeant was unable to keep its business solvent. Without inventory, it lost sales to Carco and Citgo, PDVSA's subsidiaries in Florida, and to Marathon Oil, the only other market participant. Because of the increased costs associated with refining other crudes, Trigeant was unable to sell Florida-spec asphalt at a price that allowed it to recover the

GUNSTER, YOAKLEY & STEWART, P.A.
A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW
PAGE 20

MIAMI 456031.1

25 of 145

cost of production, let alone make a profit. Further, throughout this period, the retail price for Florida-spec asphalt remained stagnant, even in the face of ever-rising prices for crude oil. In part, the price for Florida-spec asphalt remained constant because of the efforts of PDVSA through its subsidiaries/agents to depress the price for Florida-spec asphalt in both the Wholesale Market, and the Retail Markets of Tampa and Jacksonville, as part of their efforts to drive Trigeant from Florida. In sum, all these factors contributed to forcing Trigeant out of the alleged Wholesale and Retail Markets for Florida-spec asphalt.

B.     **Essential facility**

50.     Trigeant's business relied almost entirely on the ability to produce Florida-spec asphalt at its refineries. As discussed above, the only way to operate these facilities economically was to use Boscan crude oil as feedstock. Therefore, access to a supply of Boscan was an essential facility to Trigeant. PDVSA, as the only supplier of Boscan in the world, realized this fact and knew that by depriving Trigeant of this key element it would be able to remove Trigeant as a competitor from the Wholesale and Retail Markets for Florida-spec asphalt. Attempts to replicate the facility were not successful because the replacement feedstocks either failed to yield Florida-spec asphalt consistently or did so only after causing such a large amount of damage to the refinery that the process was rendered uneconomic.

C.     **Predatory Pricing and/or Primary-Line Competitive Injury**

51.     Through use of its exclusive control over the supply of Boscan crude, PDVSA and its subsidiaries were able to sell Florida-spec asphalt on the Wholesale Market at a price below Citgo/Carco's costs for purchasing such inputs for the production of Florida-

GUNSTER, YOAKLEY & STEWART, P.A.
A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW
PAGE 21

MIAMI 456031.1

26 of 145

spec asphalt. Upon information and belief, these below-cost sales began around the time that PDVSA began to cut Trigeant off from its Boscan crude supply (approximately May 2003) and continued at the very least through Trigeant EP Ltd.'s exit from the Florida-spec Wholesale and Retail Markets in March 2005. Moreover, having driven Trigeant EP Ltd. and Trigeant Ltd. out of the Florida market, PDVSA (within the Florida Wholesale and Retail Markets for Florida-spec asphalt) was subsequently able to set prices higher than competitive prices in order to recoup its investment in its earlier below-cost pricing.

### D.    Price Squeeze

52.    Through use of its exclusive control over the supply of Boscan crude, PDVSA took actions at the production level of the market to ensure that Trigeant was unable to run its business profitably. As described in greater detail above, PDVSA either refused to supply Boscan crude to Trigeant or offered it at a price well above fair market value, making it impossible for Trigeant to maintain adequate inventories at its terminals. What Trigeant could produce came at a significantly higher cost due to the damage alternate crudes inflicted on its refineries. At the same time, PDVSA ensured through Citgo and Carco that the Florida Wholesale Market was oversupplied with product so that both wholesale and retail prices remained stagnant and artificially low even while crude prices were rising, making it wholly uneconomic for Trigeant to invest in reconfiguring its refineries to process other types of base crude. This combination of actions, beginning in May 2003 and continually and repeatedly pursued by PDVSA through at least March 2005, constituted an illegal price squeeze that ultimately forced Trigeant out of the Wholesale and Retail Markets.

GUNSTER, YOAKLEY & STEWART, P.A.
A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW
PAGE 22

MIAMI 456051.1

27 of 145

## V.   PDVSA's ACTIVITIES VIOLATED VENEZUELAN LAW

53.    As noted above, PDVSA and Trigeant executed the Supply Agreement in December 2002. At the time the Supply Agreement was being negotiated, Trigeant EP Ltd. was considering the purchase of the refinery in Chickasaw, Alabama and related distribution assets in Florida. Such a purchase was premised on obtaining a steady supply of Boscan crude that could only be provided by PDVSA.

54.    Trigeant representatives met with top executives at PDVSA on a number of occasions in both the U.S. and at PDVSA's headquarters located in Caracas, Venezuela to discuss the purchase of the Chickasaw refinery and related distribution network, as well as negotiate the Supply Agreement. During these meetings, the President of PDVSA assured Trigeant that PDVSA would support the purchase by providing Boscan crude and represented to Trigeant that it should therefore go ahead with the transaction.

55.    These actions constitute an unlawful act committed by PDVSA's top management at its offices in Caracas, through its intentional, negligent or imprudent breach of the duty of good faith established in paragraph 2 of Article 1.185 of Venezuelan Civil Code, in accordance with Article 12 of the Venezuela Code of Civil Procedure. Specifically, these actions falsely induced Trigeant EP Ltd., to purchase the refinery and related distribution assets in March 2003, a transaction premised on a secure supply of Boscan crude which PDVSA failed to deliver. With this action, PDVSA breached the trust that Trigeant reasonably placed in the seriousness of PDVSA's representations.

GUNSTER, YOAKLEY & STEWART, P.A.
A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW
PAGE 23

MIAMI 456031.1

28 of 145

## VI.    VIOLATIONS ALLEGED

### A.    Count I – Attempted Monopolization and Violation of Fla. Stat. § 542.19

56.    Trigeant repeats and realleges Paragraphs 1 through 55 as though fully set forth herein.

57.    PDVSA forced Trigeant out of the Wholesale and Retail Markets for Florida-spec asphalt in an intentional and willful attempt to monopolize some or all of the Wholesale and Retail Markets for Florida-spec asphalt.  In doing so, there was a dangerous probability that PDVSA would succeed in its attempt to achieve monopoly power in the Wholesale Market and Retail Markets of Tampa and Jacksonville for finished Florida-spec asphalt given its clear majority of market share in both markets.  In short, the conduct of PDVSA was predatory and/or anticompetitive.

58.    A substantial amount of commerce within the State of Florida and within the jurisdiction of this court has been affected by the attempt of PDVSA to monopolize the Wholesale and Retail Markets for Florida-spec asphalt.

59.    The conduct of PDVSA has a direct, substantial, and reasonably foreseeable effect on trade or commerce in this state.

*Injury to Trigeant*

60.    As a direct and proximate result of the attempt of PDVSA to monopolize the Wholesale and Retail Markets for Florida-spec asphalt, Trigeant has been injured in its business.  Trigeant has been deprived of the benefit of free competition in the paving asphalt product market, has been forced to pay noncompetitive prices for Boscan and

GUNSTER, YOAKLEY & STEWART, P.A.
A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW
PAGE 24

MIAMI 4560311.1

29 of 145

finished asphalt, has been squeezed in price, has been injured by the refusal of PDVSA to deal with them, and has incurred increased costs and decreased profits.

61.    The attempt of PDVSA to monopolize the Wholesale and Retail Markets for Florida-spec asphalt has caused Trigeant damages including but not limited to loss of revenue, loss of profits and increased operating costs.

*Damages*

62.    Trigeant does not know the full extent of its damages at this time but seeks recovery of threefold the damages as provided for by Fla. Stat. §542.22, and such other damages are ascertained through discovery and presented at trial.

WHEREFORE, Plaintiffs Trigeant Ltd. and Trigeant EP LTD. demand judgment against Defendant PDVSA for damages, including threefold damages pursuant to Fla. Stat. §542.22, interest, prejudgment interest, attorneys' and paralegal fees and costs and any further relief this Court deems just and proper.

B.    Count II – Abuse of Monopoly Power and Violation of
Fla. Stat. § 542.19

63.    Trigeant repeats and realleges Paragraphs 1 through 55 as though fully set forth herein.

64.    PDVSA has engaged in various anticompetitive bad acts in order to maintain and/or strengthen its monopoly power over the Wholesale and Retail Markets for Florida-spec asphalt in Florida in violation of Fla. Stat. § 542.19.

65.    PDVSA forced Trigeant out of the Wholesale and Retail Markets in an intentional and willful attempt to maintain and/or strengthen its monopoly power over the these markets. In doing so, PDVSA also misused its monopolistic power in the separate

GUNSTER, YOAKLEY & STEWART, P.A.
A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW
PAGE 25

MIAMI 456031.1

30 of 145

markets for Boscan and in the alleged Wholesale and Retail Markets for finished Florida-spec asphalt. The conduct of PDVSA was predatory and/or anticompetitive.

66.    A substantial amount of commerce within the State of Florida and within the jurisdiction of this court has been affected by PDVSA's anticompetitive acts which served to maintain and/or strengthen its exercise of monopoly power over the Wholesale and Retail Markets for Florida-spec asphalt. Because PDVSA's actions have to a large extent been successful in forcing Trigeant out of the relevant markets, Florida wholesale and retail consumers for Florida-spec asphalt now face an increasingly concentrated and less competitive market with higher prices.

67.    The conduct of PDVSA has a direct, substantial, and reasonably foreseeable effect on trade or commerce in this state.

*Injury to Trigeant*

68.    As a direct and proximate result of PDVSA's anticompetitive acts as a monopolist, Trigeant has been gravely injured in its business. Trigeant has been deprived of the benefit of free competition in the paving asphalt product market, forced to pay noncompetitive prices for Boscan, victimized by price squeeze tactics, and injured by PDVSA's refusal to deal with it, all of which culminated in increased costs and decreased profits eventually resulting in the sale of the Chickasaw refinery and foreclosure on the Corpus Christi refinery bringing about Trigeant's exit from the Florida asphalt market.

69.    The effects of PDVSA's various anticompetitive acts which had the result of maintaining and/or strengthening its monopoly power over the Wholesale and Retail Markets for Florida-spec asphalt in Florida was to cause Trigeant damages including but not limited to loss of revenue, loss of profits and increased operating costs.

GUNSTER, YOAKLEY & STEWART, P.A.
A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW
PAGE 26

MIAMI 456031.1

31 of 145

*Damages*

70.    Trigeant does not know the full extent of its damages at this time but seeks recovery of threefold the damages as provided for by Fla. Stat. §542.22, and such other damages are ascertained through discovery and presented at trial.

WHEREFORE, Plaintiffs Trigeant Ltd. and Trigeant EP LTD. demand judgment against Defendant PDVSA for damages, including threefold damages pursuant to Fla. Stat. §542.22, interest, prejudgment interest, attorneys' and paralegal fees and costs and any further relief this Court deems just and proper.

C.    **Count III – Deceptive and Unfair Trade Practices By Refusal To Deal in Violation of Fla. Stat. § 501.201, et seq.**

71.    Trigeant repeats and realleges Paragraphs 1 through 55 as though fully set forth herein.

72.    This is a cause of action under the Florida Deceptive and Unfair Trade Practices Act.

73.    Trigeant is a consumer, as defined by Florida Statute § 501.203(7).

74.    PDVSA engaged in trade or commerce as defined by Florida Statute § 501.203(8).

75.    PDVSA controls and controlled the supply of Boscan entering the Florida market, which is an essential component in the manufacture of finished Florida-spec asphalt. Boscan is a scarce resource, which is controlled almost exclusively by PDVSA.

76.    Through its control over the supply of Boscan, and following its decision to refuse to deal with Trigeant directly, PDVSA arranged for other suppliers to refuse to supply Trigeant with Boscan. Because of PDVSA's control over and of the supply of

GUNSTER, YOAKLEY & STEWART, P.A.
A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW
PAGE 27

MIAMI 456031.1

32 of 145

Boscan, it succeeded in foreclosing the sale of Boscan to Trigeant from other outlets or suppliers.

77.     PDVSA's efforts to arrange for other suppliers to refuse to sell Boscan to Trigeant was part of its scheme to severely disadvantage Trigeant. PDVSA took the actions complained of to block Trigeant's access to Boscan in an effort to monopolize the market of Florida-spec asphalt.

78.     PDVSA, through its actions, has engaged in unfair methods of competition, unconscionable acts and practices, and unfair deceptive acts and practices in conduct of commerce.

79.     PDVSA's aforementioned conduct in precluding Trigeant from obtaining the scarce resource of Boscan from other suppliers or supply outlets is unlawful within the meaning of the Florida Deceptive and Unfair Trade Practice Act.

80.     Trigeant has been aggrieved and damaged by PDVSA's conduct in violation of Florida Deceptive and Unfair Trade Practices Act, including but not limited to loss of revenue, loss of profits and increased costs in attempting to replace Boscan or produce Florida-spec asphalt from other sources.

81.     Trigeant has also suffered special damages as a result of PDVSA's conduct in violation of Florida Deceptive and Unfair Trade Practices Act related to the diminution in value of Trigeant's refineries and associated distribution network, which were sold at a price which did not reflect the true market value of those assets.

82.     Additionally, Trigeant has suffered special damages as a result of PDVSA's conduct in violation of Florida Deceptive and Unfair Trade Practices Act related to the diminution in value of Trigeant's Corpus Christi refinery which was valued upon

GUNSTER, YOAKLEY & STEWART, P.A.
A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW
PAGE 28

MIAMI 456031.1

33 of 145

foreclosure at a price which did not reflect the true market value of that asset prior to PDVSA's wrongful conduct.

### *Injury to Trigeant*

83.    The unfair methods of competition, unconscionable acts or practice and unfair or deceptive acts or practices in the conduct of any trade or commerce of PDVSA has caused Trigeant damages including but not limited to loss of revenue, loss of profits and increased operating costs, and the diminution in value of Trigeant's refineries and distribution networks.

### *Damages*

84.    As to this Count, Trigeant requests that this Court enter an Order declaring that PDVSA's acts and practices as alleged herein violate the Florida Deceptive and Unfair Trade Practices Act; and that judgment be entered against PDVSA and in favor of Trigeant for damages, plus interest, court costs and attorney's fees, and for such other relief as the Court deems proper pursuant to Fla. Stat. §501.2105 and §501.211.

WHEREFORE, Plaintiffs Trigeant Ltd. and Trigeant EP LTD. demand judgment against Defendant PDVSA for damages, and special damages as set forth above, plus interest, court costs and attorney's fees, and for such other relief as the Court deems proper pursuant to Fla. Stat. §501.2105 and §501.211.

**D.**    **Count IV – Deceptive and Unfair Trade Practices in Attempting to Force Trigeant out of Market in Violation of Fla. Stat. § 501.201, et Seq.**

85.    Trigeant realleges Paragraph 1 through 55 above as if specifically set forth herein.

GUNSTER, YOAKLEY & STEWART, P.A.
A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW
PAGE 29

MIAMI 456031.1

34 of 145

86.    This is a cause of action under the Florida Deceptive and Unfair Trade Practices Act.

87.    Trigeant is a consumer as defined by Florida Statute §501.203(7).

88.    PDVSA engaged in trade or commerce as defined by Florida Statute §501.203(8).

89.    PDVSA controls and controlled the supply of Boscan entering the Florida market, which is an essential component in the manufacture of finished Florida-spec asphalt. Boscan is a scarce resource, which is controlled almost exclusively by PDVSA.

90.    PDVSA, through its control of the supply of Boscan, has tremendous influence on the production of Florida-spec asphalt. Through its subsidiaries and on its own, PDVSA competes in the market for production of and sale of Florida-spec asphalt.

91.    PDVSA determined to increase its control over and/or monopolize the market for Florida-spec asphalt by taking actions to force Trigeant out of the paving asphalt business.

92.    PDVSA is also a seller of finished asphalt at the wholesale and retail level and refused to sell to Trigeant as another means of forcing Trigeant out of the paving asphalt business.

93.    Towards that end, PDVSA took action to deprive Trigeant of access to Boscan and finished Florida-spec asphalt in ways that excluded or disadvantaged Trigeant arbitrarily and/or invidiously, including, but not limited to, organizing efforts to have other suppliers refuse to deal with Trigeant and increasing the costs for obtaining Boscan or finish Florida-spec asphalt to noncompetitive levels for Trigeant.

GUNSTER, YOAKLEY & STEWART, P.A.
A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW
PAGE 30

MIAMI 456031.1

35 of 145

94.    At the same time, PDVSA artificially depressed the price of Florida-spec asphalt produced by PDVSA's subsidiaries, so as to undermine and eliminate Trigeant's ability to compete with PDVSA or its subsidiaries in the Florida-spec asphalt market. Ultimately, Trigeant's exit from the Florida market resulted in an increase in prices that was and is damaging to consumers of Florida-spec asphalt in the Florida market, while allowing PDVSA to recoup the costs of its predatory pricing activity.

95.    The actions by PDVSA complained of herein succeeded in forcing Trigeant from the Florida-spec asphalt market.

96.    PDVSA, through its actions, has engaged in unfair methods of competition, unconscionable acts and practices, and unfair deceptive acts and practices in conduct of commerce.

97.    PDVSA's aforementioned conduct in forcing Trigeant from the Florida-spec asphalt market is unlawful within the meaning of the Florida Deceptive and Unfair Trade Practice Act.

98.    Trigeant has been aggrieved and damaged by PDVSA's conduct in violation of Florida Deceptive and Unfair Trade Practices Act, including but not limited to loss of revenue, loss of profits and increased costs in attempting to replace Boscan or produce Florida-spec asphalt from other sources.

99.    Trigeant requests that this Court enter an Order declaring that PDVSA's acts and practices as alleged herein violate the Florida Deceptive and Unfair Trade Practices Act; and that judgment be entered against PDVSA and in favor of Trigeant for damages, plus interest, court costs and attorney's fees, and for such other relief as the Court deems proper pursuant to Florida Statutes §501.2105 and §501.211.

GUNSTER, YOAKLEY & STEWART, P.A.
A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW
PAGE 31

MIAMI 456031.1

36 of 145

100.    Trigeant has also suffered special damages as a result of PDVSA's conduct in violation of Florida Deceptive and Unfair Trade Practices Act related to the diminution in value of Trigeant's Chickasaw refinery and associated distribution network, which were sold at a price which did not reflect the true market value of those assets.

101.    Additionally, Trigeant has suffered special damages as a result of PDVSA's conduct in violation of Florida Deceptive and Unfair Trade Practices Act related to the diminution in value of Trigeant's Corpus Christi refinery which was valued upon foreclosure at a price which did not reflect the true market value of that asset prior to PDVSA's wrongful conduct.

WHEREFORE, Plaintiffs Trigeant Ltd. and Trigeant EP LTD. demand judgment against Defendant PDVSA for damages, and special damages as set forth above, plus interest, court costs and attorney's fees, and for such other relief as the Court deems proper pursuant to Fla. Stat. §501.2105 and §501.211.

E.      **Count V – Deceptive and Unfair Trade Practices in Attempting to Monopolize a Florida Market in Violation of Fla. Stat. § 501.201, et Seq.**

102.    Trigeant realleges Paragraph 1 through 55 above as if specifically set forth herein.

103.    This is a cause of action under the Florida Deceptive and Unfair Trade Practices Act.

104.    PDVSA engaged in trade or commerce as defined by Florida Statute §501.203(8).

GUNSTER, YOAKLEY & STEWART, P.A.
A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW
PAGE 32

MIAMI 456031.1

105.   PDVSA controls and controlled the supply of Boscan entering the Florida market, which is an essential component in the manufacture of finished Florida-spec asphalt. Boscan is a scarce resource, which is controlled almost exclusively by PDVSA.

106.   PDVSA, through its control of the supply of Boscan, has tremendous influence on the production of Florida-spec asphalt. Through its subsidiaries and on its own, PDVSA competes in the market for production of and sale of Florida-spec asphalt.

107.   PDVSA determined to increase its control over and/or strengthen its monopolistic power in the market for Florida-spec asphalt by taking actions to injure Trigeant.

108.   Towards that end, PDVSA took actions to depress the price for Florida-spec asphalt produced by PDVSA's agents/subsidiaries, so as to undermine and eliminate Trigeant's ability to compete with PDVSA or its subsidiaries in the Florida-spec asphalt market.   PDVSA's actions resulted in increased costs to Trigeant as it attempted, ultimately unsuccessfully, to remain a producer of Florida-spec asphalt.

109.   The actions by PDVSA complained of herein include attempting to obtain monopoly power, and improperly maintaining and/or strengthening its monopolistic power over the Florida-spec asphalt market

110.   PDVSA, through its actions, has engaged in unfair methods of competition, unconscionable acts and practices, and unfair deceptive acts and practices in conduct of commerce.

111.   PDVSA's aforementioned conduct in misusing its market power in the Florida-spec asphalt market is unlawful within the meaning of the Florida Deceptive and Unfair Trade Practice Act.

GUNSTER, YOAKLEY & STEWART, P.A.
A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW
PAGE 33

112.   Trigeant has been aggrieved and damaged by PDVSA's conduct in violation of Florida Deceptive and Unfair Trade Practices Act, including but not limited to loss of revenue, loss of profits and increased costs in attempting to replace Boscan or produce Florida-spec asphalt from other sources.

113.   Trigeant requests that this Court enter an Order declaring that PDVSA's acts and practices as alleged herein violate the Florida Deceptive and Unfair Trade Practices Act; and that judgment be entered against PDVSA and in favor of Trigeant for damages, plus interest, court costs and attorney's fees, and for such other relief as the Court deems proper pursuant to Fla. Stat. §501.2105 and §501.211.

114.   Trigeant has also suffered special damages as a result of PDVSA's conduct in violation of Florida Deceptive and Unfair Trade Practices Act related to the diminution in value of Trigeant's Chickasaw refinery and associated distribution network, which were sold at a price which did not reflect the true market value of those assets.

115.   Additionally, Trigeant has suffered special damages as a result of PDVSA's conduct in violation of Florida Deceptive and Unfair Trade Practices Act related to the diminution in value of Trigeant's Corpus Christi refinery which was valued upon foreclosure at a price which did not reflect the true market value of that asset prior to PDVSA's wrongful conduct.

WHEREFORE, Plaintiffs Trigeant Ltd. and Trigeant EP LTD. demand judgment against Defendant PDVSA for damages, and special damages as set forth above, plus interest, court costs and attorney's fees, and for such other relief as the Court deems proper pursuant to Fla. Stat. §501.2105 and §501.211.

GUNSTER, YOAKLEY & STEWART, P.A.
A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW
PAGE 34

F.     **Count VI – Violation of Venezuelan Law**

116.    Trigeant repeats and realleges Paragraphs 1 through 55 as though fully set forth herein.

117.    This is a cause of action under Article 1.185 of the Venezuelan Civil Code[5] as allowed by Article 32 of the Venezuelan Act on Private International Law[6].

118.    PDVSA engaged in trade or commerce in Venezuela as defined by Articles 2 and 3 of the Venezuelan Code of Commerce.

119.    PDVSA, through its actions, has engaged in unlawful acts in the conduct of commerce in violation of the implied duty of good faith imposed on all individuals and entities[7] for the performance of their acts[8]. This implied duty of good faith stated in paragraph 2 of Article 1.185 of Venezuelan Civil Code in accordance with Article 12 of Venezuelan Code of Civil Procedure[9] lead Trigeant to reasonably believe that PDVSA was acting in good faith[10] when PDVSA either intentionally, negligently or imprudently

---

[5] Article 1.185 of the Civil Code states in translation:
   *"He who intentionally, negligently, or imprudently has caused damage to another is bound to repair the same.*
   *Also, he who has caused damage to another exceeding, in the exercise of his right, the limits set by good faith or by the purpose for which such right has been conferred on him, is bound to repair it."*
[6] Article 32 of the Venezuelan Act on Private International Law states the in translation:
   "Article 32: Unlawful acts are governed by the law of the place where their effects have been caused. However, the victim may also claim the application of the law of the State where the cause which gave rise to the unlawful act took place."
[7] See, paragraph 2 of Article 1.185 of the Civil Code stating that *"… he who has caused damage to another exceeding … the limits set by good faith…, is bound to repair it."*
[8] Including dealings for the formation of contracts.   Cfr. MELICH-ORSINI, José, *Doctrina General del Contrato*, (3rd Ed.) Editorial Jurídica Venezolana, Caracas 1997 page 38.
[9] Article 12 of the Code of Civil Procedure states that:
   "…in the interpretation of a juridical act, Judges will look to the demands of the Law, the truth and the good faith…".
[10] The limits of Good faith have repeatedly been explained by Venezuelan Supreme Court. See, *Video Way Productora, C.A. v. Min. de Infraestructura*, TSJ, SPA, 10-3-2007 (citing *Politécnico Santiago Mariño v. Min of Education*, TSJ, SPA, 02-11-2004) "…Good faith means trust, confidence, and honorability, it refers to the fact that one of the parties relies on another party's faithful behavior in the performance of its obligations, and trusts that such other party will not deceive it. Good faith means that a man believes and

GUNSTER, YOAKLEY & STEWART, P.A.
A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW
PAGE 35

exceeded the limits of good faith, inducing Trigeant to purchase the refinery and related distribution assets when PDVSA officials assured Trigeant in Caracas that PDVSA would support the purchase by providing Boscan crude. With this action, and by denying to provide Boscan to Trigeant, PDVSA ultimately defrauded the trust that Trigeant reasonably placed in PDVSA's representations.

### *Injury to Trigeant*

120.    Trigeant has been aggrieved and damaged by PDVSA's fault in violation of Venezuelan Civil Code Article 1.185 in accordance with Article 12 of the Venezuelan Code of Civil Procedure, including but not limited to those damages allowed under the Venezuelan law principle of the integrity of compensation of damages,[11] arising as an immediate and direct consequence of PDVSA's unlawful acts.[12] Such damages include but are not limited to: 1) the loss of Trigeant's patrimony invested in the purchase of the Chickasaw refinery and associated distribution network which ultimately had to be sold off to Tripso, as well as the diminution in value of Trigeant's Corpus Christi refinery which was valued upon foreclosure at a price which did not reflect the true market value of that asset prior to PDVSA's wrongful conduct ("Daño Emergente"), and 2) the loss of expected profits ("lucro cesante"),[13] loss of revenue, and increased costs in attempting to replace Boscan or produce Florida-spec asphalt from other sources.

---

trusts that a statement of will shall have its usual effects in a specific case, the same effects as  it has ordinarily and normally had in analogous cases..."
[11] Civil Code Article 1.196 states as follows: "The obligation to repair extends to all material or moral damages that are caused by the Unlawful Act. The Judge may award a compensation to the victim in case of .... Threat to her honor, her reputation, .... "
[12] Civil Code Art.1275 Civil Code.
[13] Civil Code Article 1273. *Cfr: MELICH ORSINI, José. "La responsabilidad civil por hechos ilícitos". Biblioteca de la Academia de Ciencias Políticas y Sociales. Caracas, 1994, Tomo I, p.41, ¶ 2.*

GUNSTER, YOAKLEY & STEWART, P.A.
A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW
PAGE 36

*Damages*

121.    Trigeant does not know the full extent of its damages at this juncture.  At such time as Trigeant has ascertained more clearly the extent of its damages, it will seek leave to amend to allege them and will prove them at trial.

122.    As to this Count, Trigeant requests that this Court enter judgment against PDVSA declaring that PDVSA's unlawful acts as alleged herein violate Venezuelan Civil Code Article 1.185  as allowed by Article 32 of the Venezuelan Act on Private International Law; and that judgment be entered against PDVSA and in favor of Trigeant for damages, plus interest, court costs and attorney's fees, and for such other relief as the Court deems just and proper pursuant to Articles 1.196, 1.273 and 1.275 of the Venezuelan Civil Code including an award of moral damages caused by PDVSA's fault.[14]

**Plaintiffs demand a jury trial in this action.**

Dated this 24th day of March, 2008.

> GUNSTER, YOAKLEY & STEWART, P.A.
> *Attorneys for Plaintiff Trigeant Ltd. and*
> *Trigeant EP Ltd.*
> 777 S. Flagler Drive, Suite 500 East
> West Palm Beach, Florida  33401
> Telephone:  561-655-1980
> Facsimile:  561-655-5677
>
> By: _Rebecca Cavendish_
>
> DAVID ATKINSON
> Florida Bar No.  767239
> AARON TANDY
> Florida Bar No. 190144
> REBECCA CAVENDISH
> Florida Bar No. 152153

---

[14] Venezuelan Civil Code Article 1.196.

GUNSTER, YOAKLEY & STEWART, P.A.
A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW
PAGE 37

**VINSON & ELKINS LLP**
*Of Counsel for Plaintiff Trigeant Ltd. and Trigeant EP Ltd.*
*Pro Hac Vice Application Forthcoming*
1001 Fannin Street, Suite 2500
Houston, Texas 77002
Telephone: 713-758-2222
Facsimile: 713-758-2346
JAMES LOFTIS
Texas Bar No. 12491210
EUGENE SILVA II
Texas Bar No. 24027978
PERSIS MEHTA
Texas Bar No. 24051040
JUSTIN MARLLES
Texas Bar No. 24060222

GUNSTER, YOAKLEY & STEWART, P.A.
A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW
PAGE 38

MIAMI 456031.1

43 of 145

## INDEX OF EXHIBITS

Map of Florida Hot-Mix Plants and Asphalt Terminals.................................1

Florida specifications for asphalt used in state projects.................................2

Map of PADD I.................................................................................3

GUNSTER, YOAKLEY & STEWART, P.A.
A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW
PAGE 39

MIAMI 456031.1

# FLORIDA HOT MIX ASPHALT PLANTS AND ASPHALT TERMINALS



Number of Hot Mix Asphalt Plants

- Cape Canaveral (10)
- Fort Lauderdale (18)
- Jacksonville (11)
- Pensacola (9)
- Tampa (23)

## SECTION 916
## BITUMINOUS MATERIALS

**916-1 Superpave PG Asphalt Binder:**

916-1.1 Requirements: Superpave PG asphalt binders, identified as PG 64-22, PG 67-22, and PG 76-22, shall meet the requirements of 916-1.2, AASHTO M-320 and the following additional requirements:

1. The mass loss AASHTO T-240 shall be a maximum of 0.5% for all grades.

2. The spot test AASHTO T-102 with standard naphtha shall be negative for all grades. As an exception, a positive spot will be accepted if the PAV Residue (AASHTO R-28) at 110 °C meets all the requirements for the particular grade.

3. The smoke point FM 5-519 shall be a minimum of 260°F for all grades.

4. The intermediate test temperature at 10 rad/s. for the Dynamic Shear Rheometer test AASHTO T-315 shall be 25°C for all grades.

5. An additional high temperature grade of PG 67 is added for which the high test temperature at 10 rad/sec for the Dynamic Shear Rheometer test AASHTO T-315 shall be 67°C.

6. All PG asphalt binders having a high temperature designation of PG 67 or lower shall be prepared without modification.

7. All PG asphalt binders having a high temperature designation higher than PG 67 shall be produced with a styrene-butadiene-styrene (SBS) or styrene-butadiene (SB) elastomer polymer modifier and resultant binder shall meet all requirements of this Specification; in addition the phase angle at 76°C (AASHTO T-315) shall be less than or equal to 75 degrees.

8. The maximum viscosity AASHTO T-202 shall be 2400 poises for PG 64-22 and 3600 poises for PG 67-22.

All hot mix asphalt (except hot mix asphalt containing 20% RAP or greater) shall contain Superpave PG asphalt binder grade PG 67-22 unless otherwise specified in the plans and/or Specifications for the hot mix asphalt product.

For all PG binder used in all hot mix asphalt, silicone shall be added to the PG binder at the rate of 25 cm³ of silicone mixed to each 5,000 gal. of PG binder. If a disbursing fluid is used in conjunction with the silicone the resultant mixture containing the full 25 cm³ of silicone shall be added in accordance with the manufacturer's recommendation. The blending of the silicone with the PG binder shall be done by the supplier prior to the shipment.

All PG binder to be used in asphalt rubber binder for Friction Course mixes and other hot mix asphalt products containing RAP shall contain 0.5% heat stable anti-strip additive by weight of PG binder unless specifications for the hot mix asphalt product requires testing by FM 1-T 283 and the test results indicate it is not required, or the mixture contains hydrated lime. Where FM 1-T 283 indicates an anti-strip additive is required, it shall be from 0.25 to 0.75%. The anti-strip additive shall meet the requirements of 916-5. The anti-strip additive shall be introduced into the PG binder by the supplier during loading.

Where PG binder is used in mixes containing reclaimed asphalt pavement (RAP), the requirements of 334-2.3.4 must also be met.

916-1.2 Qualified Products List: The Superpave PG asphalt binders supplied under this Specification shall be one of the products included on the Qualified Products List as specified in 6-1.3. Any marked variation from the original test values for a material below the established limits or evidence of inadequate quality control or field performance of a material will be



considered to be sufficient evidence that the properties of the material have changed, and the material will be removed from the Qualified Products List.

For each binder grade, the supplier may be required to submit to the State Materials Office a split sample of material representative of test results submitted with the Product Evaluation Application. In addition, for modified binders, the original PG binder grade, the modifier product designation, and amount added shall be indicated. Suppliers shall not ship any PG binder until notified that the product is on the Qualified Products List and an approved Quality Control Program meeting the requirements of 916-1.3 has been implemented.

916-1.3 Quality Control Program: The supplier of Superpave PG asphalt binder shall at a minimum have a Quality Control Program meeting the requirements of this Specification which is based on AASHTO R-26. The Quality Control Program shall be submitted in electronic format to the State Materials Office for approval.

The requirements for the Quality Control program apply to the supply location of PG binders for the use on Florida Department of Transportation projects. The supply location of PG binder may represent refinery production, terminal distribution, blending, processing and/or modification location. Rack blending (blending from two tank sources) will be permitted to meet the requirements for a PG asphalt binder product. Any special handling requirements such as rack blending and manufacture of polymer modified asphalt shall be described in the Quality Control program. The requirements of these Specifications for a Quality Control Program do not apply to Recycle Agents at this time.

916-1.3.1 Identification of Personnel and Supply Locations: The supplier's primary and secondary representatives responsible for Quality Control shall be identified by name, title, address, telephone, fax and e-mail address. At least one of the representatives shall be located at the supply location. The supply locations shall be identified by name, address and telephone.

916-1.3.2 Specification Compliance and Quality Control Testing: Specification Compliance Testing shall consist of complete testing of each PG binder shipped in accordance with AASHTO M-320 and 916-1.1 of these Specifications. Results of Specification Compliance Testing shall be available to the supplier within five working days of sampling. Specification Compliance Testing shall be conducted by a testing laboratory that participates at least annually in the AMRL Reference Sample Testing Program. The primary testing lab and any other labs to be used for Specification Compliance Testing shall be identified in the suppliers Quality Control Program. The results from each AMRL proficiency Sample for each testing laboratory shall be forwarded by the supplier for each supply location in electronic format to the State Materials Office. Acceptable performance in the AMRL proficiency Sample Testing Program shall be a minimum of 3 for each test. A rating of less than 3 shall require identification of appropriate action on the part of the supplier and be acceptable to the State Materials Engineer.

Quality Control testing as a minimum shall consist of testing a representative sample of each PG binder shipped by the supplier in accordance with either:

(1) AASHTO T-202 Standard Test Method for Viscosity of Asphalts by Vacuum Capillary Viscometer or

(2) AASHTO T-315 Test Method for Determining Rheological Properties of Asphalt Binder using a Dynamic Shear Rheometer (DSR).

Results of Quality Control Testing shall be available to the supplier within five hours of sampling. The Quality Control testing and location where the test will be done shall be identified in the suppliers Quality Control Program.

916-1.3.3 Frequency of Sampling and Testing: Sampling of PG binders shall be done in accordance with AASHTO T-40. Initial Specification Compliance test results shall be required for each PG binder grade for each new LOT of material which will be further subjected to Quality Control Testing in accordance with 916-1.3.2. A new LOT will occur when the material in a tank changes and the Specification Compliance Test may no longer be representative of the material in the tank. This may be due to an incoming bulk shipment of material, change in refinery run, the manufacture of a product, or a blend of material in a tank. Additional testing is as follows:

(1) Any PG binder shipped to a Department project during any one calendar month shall be tested at least once during that month for Specification Compliance in accordance with 916-1.3.2.

(2) When being shipped to Department projects, samples shall be obtained by the supplier and tested for Quality Control testing in accordance with 916-1.3.2. A single one quart representative sample of each PG binder shall be obtained and tested by the supplier each calendar week; for each rack blended PG binder, additional representative samples shall be obtained daily. Each Quality Control sample and additional daily rack blended samples shall be adequately identified and retained not less than eight weeks at the supply location. Any PG binder not shipped to Department projects is not required to be sampled or tested.

(3) Split samples of any PG binder will be provided when requested by a representative of the Department. In this situation three representative one quart samples will be obtained by the supplier under the direction of the Department. One sample will be submitted to the State Materials Office, one will be tested by the supplier for Specification Compliance and one will be tested by the supplier for Quality Control. The method of obtaining the three representative one quart samples is to obtain a single gallon sample, which is then stirred and poured into three one quart cans. When split samples are requested by the Department, the results from both parties will be made available within ten working days.

(4) For each rack blended PG binder, identify minimum daily Process Control Testing in the QC Plan.

916-1.3.4 Reporting: A monthly report by the supplier containing Specification Compliance and Quality Control Test results for each PG binder LOT shall be submitted by the supplier in electronic format using the form provided by the Department to the State Materials Office within seven days following the end of the calendar month. Test results for split samples shall also be included. Process Control Test results shall not be included. Copies of these monthly reports and supporting test reports shall be available at the supply location for a minimum of 3 years.

The report shall consist of the Specification compliance testing and Quality Control Testing of the following as applicable by these Specifications.

| SUPERPAVE PG ASPHALT BINDER | | |
|---|---|---|
| Test and Method | Conditions | Specification Minimum/Maximum Value |
| Original Binder | | |

| Superpave PG Asphalt Binder Grade | | Report |
|---|---|---|
| Qualified Products List Number | | Report |
| Polymer Modifier Type | (PG 76-22 Only) | Report |
| Spot Test, AASHTO T102 | Standard with Naphtha Solvent | Negative for all grades |
| Solubility, AASHTO T44 | in Trichlorethylene | Minimum 99.0% |
| Smoke Point, FM 5-519 | COC | Minimum 260°F |
| Flash Point, AASHTO T48 | COC | Minimum 450°F |
| Rotational Viscosity, ASTM D4402 | 275°F | Maximum 3 Pa-s |
| Absolute Viscosity, AASHTO T202 | 140°F | As Required for Quality Control Testing |
| Dynamic Shear Rheometer, AASHTO T315 | G*/sin δ, Test Temperature @ 10 rad/sec, °C<br>Phase Angle, δ, (PG 76-22 Only) | Minimum 1.00 kPa Maximum 75 degrees |
| Rolling Thin Film Oven Test Residue (AASHTO T240) | | |
| Rolling Thin Film Oven, AASHTO T240 | Mass Loss% | Maximum 0.50 |
| Dynamic Shear Rheometer, AASHTO T315 | G*/sin δ, Test Temperature @ 10 rad/sec, °C | Minimum 2.20 kPa |
| Pressure Aging Vessel Residue (AASHTO R-28) at 100°C | | |
| Dynamic Shear Rheometer, AASHTO T315 | G* sin δ, 10 rad/sec. @ 25°C | Maximum 5000 kPa |
| Creep Stiffness, AASHTO T313 | S (Stiffness), @ 60 sec. @ -12°C<br>M-value, @ 60 sec. @ -12°C | Maximum 300 Mpa Minimum 0.300 |
| Pressure Aging Vessel Residue (AASHTO R-28) at 110°C (Positive Spot Only) | | |
| Dynamic Shear Rheometer, AASHTO T315 | G* sin δ, 10 rad/sec. @ 25°C | Maximum 5,000 kPa |
| Creep Stiffness, AASHTO T313 | S (Stiffness), @ 60 sec. @ -12°C<br>M-value, @ 60 sec. @ -12°C | Maximum 300 Mpa Minimum 0.300 |

**916-1.3.5 Notification and Evaluation:** In the event that a Specification Compliance test is outside specification requirements or a Quality Control test is outside limits established by the supplier as part of his Quality Control Program shipments of that product to

Department projects will cease immediately and the Contractor and the State Materials Office will be notified and the product retested for Specification Compliance (resampling as appropriate). Where the retest for Specification Compliance meets all requirements, shipments of that product may resume. Where off-specification material has been shipped and the retest confirms the original test, the Contractor and State Materials Office will be informed of the steps taken to achieve specification compliance on the product shipped.

Where off-specification materials has been shipped, further shipment of that product to Department projects shall remain suspended until the cause of the problem is evaluated and corrected by the supplier to the satisfaction of the State Materials Engineer.

### 916-1.3.6 Certification and Verification:

The supplier shall furnish certification on the bill of lading for each shipment of PG binder delivered to a Department project that includes: the quantity, the Superpave PG asphalt binder grade (including QPL number), PG binder LOT, a statement that the binder is in conformance with 916-1 and the suppliers Quality Control Program, and the quantity of silicone and anti-strip agent addition as applicable, including product designation (QPL number as applicable). Any special handling or temperature requirements shall be indicated on the certification and are solely the responsibility of the Contractor to follow.

The Department may sample and test PG binder from the suppliers storage tank, the delivery vehicle, and/or Contractors storage tank to verify and determine compliance with this and other specification requirements. Where these tests identify material outside specification requirements, the State Materials Engineer may require the supplier to cease shipment of that PG binder product. Further shipment of that PG binder product to Department projects may remain suspended until the cause of the problem is evaluated and corrected by the supplier as necessary to the satisfaction of the State Materials Engineer.

### 916-2 Recycling Agents:

**916-2.1 Requirements:** The asphalt recycling agent (RA) shall be an asphalt cement (PG asphalt binder) or an asphalt cement blended (as necessary) with a softening agent or flux oil, and shall meet the following requirements:

| RECYCLING AGENTS | | |
|---|---|---|
| Test | Conditions | Recycling Agent Minimum/Maximum Value |
| Viscosity – poises | 140°F | Target Viscosity ± 20% |
| Viscosity Ratio (Residue from Thin Film Oven Test) | Visc. 140°F after TFOT / Visc. 140°F before TFOT | maximum 3 |
| Smoke Point | COC | minimum 260°F |
| Flash Point | COC | minimum 400°F |
| Solubility | in Trichlorethylene | minimum 97.5% |

Rack blending of recycling agents (blending from two RA tank sources) will be permitted to meet a required target viscosity value.