# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-80584-CIV-MIDDLEBROOKS/JOHNSON

TRIGEANT LTD.
and TRIGEANT EP LTD.,
      Plaintiffs,

v.

PETROLEOS DE VENEZUELA, S.A.,
      Defendant.

_____/

## ORDER GRANTING DEFENDANT'S (SECOND) MOTION TO DISMISS (DE 119)

THIS CAUSE comes before the Court upon Defendant's ("PDVSA") Motion to Dismiss Plaintiffs' Third Amended Complaint ("Motion") (DE 119), filed on October 5, 2009. Plaintiffs ("Trigeant") filed a response (DE 120) to which Defendant replied (DE 121).

While PDVSA's Motion was pending, Trigeant filed several motions: a Renewed Motion to Compel Production of Documents and Answers to Interrogatories Related to Jurisdiction (DE 122), and a Motion to Enlarge Pretrial Deadlines (DE 123). PDVSA filed a Memorandum in Opposition to Trigeant's Renewed Motion to Compel (DE 124), to which Trigeant responded (DE 125).

The Court has reviewed the pertinent parts of the record and is advised in the premises. For the reasons stated below, PDVSA's Motion shall be granted with prejudice as to the direct acts of PDVSA and acts of Carco that were alleged against PDVSA via agency; and granted without prejudice as to the acts of Petroleo and Citgo, PDVSA's alleged agents.

1

I.      **Background**

      A.      **Trigeant's Second Amended Complaint ("SAC") (DE 11) and PDVSA's (First) Motion to Dismiss (DE 44)**

          On July 10, 2008, Trigeant filed a nine-count antitrust action against PDVSA pursuant to Florida's Antitrust Act (FLA. STAT. § 542.19), Florida's Deceptive and Unfair Trade Practices Act (FLA. STAT. § 501.201 *et seq.*), the Sherman Act (15 U.S.C. § 2), the Clayton Act (15 U.S.C. § 13), and Article 1.185 of the Venezuelan Code. (DE 11 at ¶¶ 1-4.) Trigeant alleged the following in its SAC.

          PDVSA is a Venezuelan state-owned corporation that is in the business of producing, supplying, and selling crude oil and other petroleum products around the world, including into and within the State of Florida. (DE 11 at ¶ 7.) "PDVSA completely controlled the actions of its U.S. agents and subsidiaries, Citgo Petroleum Corporation ("Citgo") and Citgo Asphalt Refining Company ("Carco"). Through these agents and subsidiaries, and by its own actions, PDVSA is active in the paving asphalt market along the entire U.S. Atlantic coast, including the State of Florida." (DE 11 at ¶ 7.)

          In describing PDVSA's anticompetitive conduct, Trigeant referred to a long-term supply agreement executed in December 2002, in which PDVSA promised to provide Boscan crude oil to Trigeant at a fair market price. (DE 11 at ¶ 37.) PDVSA abused monopoly power or attempted to obtain monopoly power by canceling its supply agreement and refusing to deal with Trigeant. (DE 11 at ¶¶ 45, 47.) PDVSA's acts, aimed at attaining/abusing monopoly power, forced Trigeant out of the market. (DE 11 at ¶¶ 58, 66.)

          PDVSA also organized efforts to have other suppliers refuse to deal with Trigeant while

2

artificially depressing the price of Florida-spec asphalt produced by its subsidiaries, so as to undermine and eliminate Trigeant's ability to compete with PDVSA or its subsidiaries. (DE 11 at ¶¶ 94-95.) Trigeant referred to an agreement, formalized on or about February 24, 2003, that made Citgo PDVSA's sole representative and agent for the sale and marketing of crude oil and finished asphalt in the U.S. market. (DE 11 at ¶ 37.) Trigeant alleged that its forced exit from the market resulted in an increase in the price of Florida-spec asphalt. (DE 11 at ¶ 95.)

In its (first) Motion to Dismiss, PDVSA provided six grounds for dismissal of the action. Specifically, PDVSA asserted the following: (1) the Court lacked subject matter jurisdiction pursuant to FED. R. CIV. P. 12(b)(1) because PDVSA is an agency or instrumentality of a foreign state and is entitled to immunity under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602-11; (2) the Court lacked personal jurisdiction pursuant to FED. R. CIV. P. 12(b)(2) because of the FSIA immunity; (3) the Court lacked subject matter jurisdiction because Trigeant's claims presented a non-justiciable political question; (4) Trigeant's claims were barred by the act of state doctrine; (5) principles of international comity prevented jurisdiction; and (6) Trigeant failed to state a claim upon which relief could be granted under the antitrust laws pursuant to FED. R. CIV. P. 12(b)(6). (DE 44 at ¶¶ 1-6.)

PDVSA alleged that it is an instrumentality of the Venezuelan government in charge of executing national oil policy and is therefore immune under the FSIA. (DE 44 at 2.) PDVSA claimed that Trigeant's SAC failed to sufficiently allege that PDVSA fell under the commercial activity exception ("CAE") to the immunity provided by the FSIA. (DE 44 at 6.) PDVSA stated that Trigeant made only conclusory allegations concerning direct acts by PDVSA in order to show that the conduct which formed the basis of the complaint fell within the commercial activity exception to

immunity under the FSIA. (DE 44 at 4 n.4.) According to PDVSA, the execution of Venezuelan oil policy could not fall under the commercial activity exception to the FSIA. (DE 44 at 7.) PDVSA further asserted that it did not deal with Trigeant; PDVSA Petroleo ("Petroleo"), Citgo, and Carco were the entities that had a business relationship with Trigeant. (DE 44 at 2.) Contrary to what Trigeant had claimed, PDVSA asserted that Trigeant entered into supply agreements with Petroleo, not PDVSA. (DE 44 at 2.) PDVSA stated that Trigeant failed to fulfill its obligations under those supply contracts, and due to its non-performance, a tribunal of the International Court of Arbitration awarded Petroleo approximately thirty-six million dollars in damages.[1] (DE 44 at 2.)

PDVSA asserted that it established subsidiary companies, such as Petroleo, "with autonomy to make commercial decisions and enter into commercial agreements with third parties." (DE 44 at 2.) PDVSA averred that Trigeant made mere conclusions as to the existence of an agency relationship between PDVSA and Petroleo, which were insufficient as a matter of law because none of the elements for establishing an agency relationship between parent (PDVSA) and subsidiary (Petroleo) had been adequately alleged in the SAC. Therefore, Trigeant's allegations of any agency relationship between PDVSA and the companies named in the SAC failed as a matter of law to establish any exception to the FSIA. (DE 44 at 6.) PDVSA pointed out that the February 24, 2003 Sales Representation Agreement cited by Trigeant in the SAC was actually entered into by Petroleo (not PDVSA) and Citgo.[2] (DE 44 at 5 n.5.)

---

[1] An Award issued by the International Court of Arbitration did refer to supply agreements between Petroleo and Trigeant.

[2] PDVSA provided the Court with a copy of this Agreement. (DE 49 at Exhibit B.)

**B.      Order Granting PDVSA's (First) Motion to Dismiss (DE 111)**

As a threshold matter, the Court had to determine whether it had subject matter jurisdiction over the claims at issue.  The Court found that it did not have subject matter jurisdiction due to PDVSA's immunity under the FSIA and did not consider PDVSA's remaining grounds for dismissal. (DE 111 at 9.) Because there was some dispute as to the facts pleaded by Trigeant in the SAC, and PDVSA provided the Court with evidence sufficient to resolve the dispute, the Court based its disposition of the First Motion to Dismiss on the SAC supplemented by the Court's resolution of disputed facts. (DE 111 at 9.)

Because PDVSA qualified as an agency or instrumentality of a foreign state within the meaning of the FSIA, it was presumptively immune from this Court's jurisdiction. (DE 111 at 12.) According to the Court, the issue was whether Trigeant had overcome the presumption of immunity by producing some facts/evidence that the conduct which formed the basis of the SAC fell under the CAE to the FSIA. (DE 111 at 12.) The Court noted that Trigeant only referred to one specific fact that may have led to the application of the CAE to immunity: the Supply Agreement between PDVSA and Trigeant that was subsequently canceled by PDVSA. (DE 11 at ¶¶ 37, 45, 47.) The Court found that the Supply Agreement at issue was actually between Petroleo (not PDVSA) and Trigeant. (DE 111 at 12.) The Court also found that because Trigeant repeatedly referred to PDVSA when it was referring to acts taken by Petroleo, the Court could not conclude that PDVSA's *direct* acts were sufficient to support the CAE to sovereign immunity under the FSIA. (DE 111 at 12.) The Court held that it could not assume jurisdiction based on PDVSA's direct acts. (DE 111 at 12.)

In regards to the FSIA and agency, the Court acknowledged that the activities of an agent could be attributed to the principal for jurisdictional purposes under the FSIA. (DE 111 at 13.)

5

According to the Court, Trigeant bore the burden of asserting facts sufficient to withstand a motion to dismiss regarding the agency relationship; majority shareholding and majority control of the board of directors were, without more, insufficient to establish an agency relationship. (DE 111 at 13.) According to the Court, the issue was whether Trigeant had overcome the presumption of immunity by producing some facts/evidence that PDVSA's subsidiaries' conduct, which formed the basis of the SAC, fell under the CAE to the FSIA and could be attributed to PDVSA via agency. (DE 111 at 13.)

The Court found that Trigeant mostly made conclusory statements of control, alleging only one specific fact: a formal sales representation agreement between PDVSA (the alleged principal) and Citgo (the alleged agent). The Court found that this agreement was actually between Petroleo (not PDVSA) and Citgo. (DE 111 at 13.) The Court further found that the following alleged facts were insufficient to withstand a motion to dismiss for lack of subject matter jurisdiction under the FSIA: PDVSA and Petroleo described their corporate purpose using similar wording; and potential clients of Petroleo could fill out an application form and mail it to PDVSA's address. (DE 111 at 14.) The Court held that Trigeant had not met its burden of producing some facts/evidence that PDVSA's subsidiaries' conduct, which formed the basis of the SAC, fell under the CAE to the FSIA and could be attributed to PDVSA via agency. (DE 111 at 14.) The Court decided that it could not assume jurisdiction over PDVSA based on the acts of its subsidiaries. (DE 111 at 14.)

In regards to jurisdictional discovery under the FSIA, the Court adhered to a well-established principle that it should be ordered circumspectly and only to verify allegations of specific facts crucial to an immunity determination. (DE 111 at 14.) The Court granted PDVSA's first Motion to Dismiss due to lack of subject matter jurisdiction without allowing further jurisdictional discovery because Trigeant had failed to allege specific facts, that if verified through jurisdictional discovery, would have

6

established an exception to immunity. (DE 111 at 15.) The Court granted Trigeant leave to amend the SAC to:

> allege *specific* facts that, if proved through jurisdictional discovery, would: (1) establish a nexus between PDVSA's direct and particularized commercial acts and the claims asserted by Plaintiffs or (2) allow the Court to attribute the commercial acts of PDVSA's subsidiaries, which form the basis of the Complaint, to PDVSA via an agency relationship.

(DE 111 at 16.)

## C.   Trigeant's Third Amended Complaint ("TAC") (DE 112)

On September 16, 2009, Trigeant resubmitted its nine-count antitrust action pursuant to Florida's Antitrust Act (FLA. STAT. § 542.19), Florida's Deceptive and Unfair Trade Practices Act (FLA. STAT. § 501.201 *et seq.*), the Sherman Act (15 U.S.C. § 2), the Clayton Act (15 U.S.C. § 13), and Article 1.185 of the Venezuelan Code. (DE 112 at ¶¶ 1-4.) Trigeant requests damages resulting from the anticompetitive conduct of PDVSA and its agents in regards to the wholesale and retail market for Florida-spec asphalt in the State of Florida.[3]   (DE 112 ¶¶ 1-4.)

According to Trigeant, PDVSA is a Venezuelan state-owned corporation that, starting in December 2002 and continuing through the present, controlled the actions of its Venezuelan and American agents and wholly-owned subsidiaries: Petroleo, Citgo, and Carco.[4]   (DE 112 at ¶ 7.) Trigeant alleges that PDVSA and the stated agents and subsidiaries sell Boscan crude oil—a key

---

[3] Florida-spec asphalt is a paving asphalt that meets the specifications for state highway construction imposed by the State of Florida's Department of Transportation. (DE 112 at ¶ 55.)

[4] More precisely, Carco was previously a wholly-owned subsidiary of Citgo, which is a wholly-owned subsidiary of PDVSA. (DE 112 at ¶ 10.)

input in the manufacture of Florida-spec asphalt—into the United States.[5]  (DE 112 at ¶ 7.)

While PDVSA is an "agency or instrumentality of a foreign state" as defined in the FSIA, 28 U.S.C. § 1603(b), Trigeant alleges that it is not entitled to sovereign immunity and is subject to the jurisdiction of this Court because it engaged in commercial activities in Venezuela which have had a direct effect in the United States.  (DE 112 at ¶ 12.)  Additionally, Trigeant alleges that PDVSA is not entitled to sovereign immunity and is subject to the jurisdiction of this Court because it engaged in commercial activities in the United States through its aforementioned subsidiaries and agents.  (DE 112 at ¶ 13.)

Trigeant alleges the following to be PDVSA's "direct acts": PDVSA's "commercial activities within, or with a direct effect upon, the United States," upon which Trigeant justifies the application of the CAE to sovereign immunity:

- PDVSA has long-term crude oil supply agreements with Citgo for a portion of Citgo's crude oil requirements at its Lake Charles, Corpus Christi, Paulsboro and Savannah refineries.  (DE 112 at ¶ 14.)

- Beginning in December 2002, PDVSA controlled the actions of its subsidiaries, Petroleo, Citgo, and Carco, when it approved an emergency shareholders' resolution ("Shareholder Resolution") giving PDVSA's president complete authority over PDVSA and its subsidiaries while dissolving their executive committees.[6]  (DE 112 at ¶ 15.)

_____

[5] Citgo refines and markets petroleum products within the State of Florida.  (DE 112 at ¶ 9.)  Carco served as the largest asphalt refiner during the "Relevant Period."  (DE 112 at ¶ 10.)

[6] According to the attached PDVSA emergency shareholders' resolution, dated December 8, 2002, the President of PDVSA would be delegated with the "corporate prerogatives, functions and levels of authority for PDVSA and its subsidiaries, corresponding to the Executive Committee, the Planning and Finance Committee and the Operations Committee in accordance

- Also in December 2002, Petroleo entered into a long-term supply agreement with Trigeant ("Trigeant Supply Agreement"), whereby Petroleo promised to provide Boscan crude to Trigeant at a fair market price. In March 2003, while the PDVSA Shareholder Resolution remained effective, Col. Gustavo Perez Issa ("Issa"), who had been granted effective control of PDVSA, ordered that no Boscan crude was to be shipped to Trigeant.[7] (DE 112 at ¶ 17.) Although Issa issued this order in his capacity as the effective head of PDVSA, it was carried out by PDVSA's agents and subsidiaries, Petroleo and Citgo.[8] (DE 112 at ¶ 18.)

- Following Issa's order, Trigeant representatives traveled to Caracas on several occasions to talk with PDVSA representatives. (DE 112 at ¶¶ 19-26.) For example, on or around April 6 through April 9, 2003, Trigeant representatives met with PDVSA director and effective head of PDVSA, Issa, to discuss restoring Boscan crude sales to Trigeant in the United States. (DE 112 at ¶ 20.) The meeting did not result in the resumption of Boscan crude sales by Petroleo/Citgo. (DE 112 at ¶ 21.) Similarly, on or around June 5 through June 6, 2003, Trigeant representatives met with PDVSA representative Nelson Reyes to discuss pricing premised upon the resumption of Boscan crude sales to Trigeant in the United States. (DE

---

with the Manual of Delegation of Corporate Authority of PDVSA and its subsidiaries in effect, from this date and for the time that the emergency of the Oil Industry or the restructuring process of Petroleos de Venezuela S.A. and its subsidiaries subsists." (DE 112 at Exhibit 4.)

[7] These shipments of Boscan crude were supposed to originate in Venezuela with the United States as their ultimate destination, and were to be used almost exclusively for the production of Florida-spec asphalt for sale in Florida. (DE 111 at ¶ 17.)

[8] On February 24, 2003, Petroleo and Citgo entered into a Sales Representation Agreement, whereby Citgo would promote and obtain orders for sales of crude oil to customers and prospective customers in the United States. (DE 112 at Exhibit 7.) The Agreement explicitly stated that it did not create a principal-agent relationship between Petroleo and Citgo. (DE 112 at Exhibit 7.)

112 at ¶ 23.)  Despite reaching a provisional agreement on pricing, PDVSA did not allow Petroleo/Citgo to resume sales of Boscan crude oil under the Trigeant Supply Agreement.[9] (DE 112 at ¶ 23.)

Trigeant also alleges a chain of agency between PDVSA, Petroleo, Citgo, and Carco, which subjects PDVSA to the jurisdiction of this Court for the commercial activities of Petroleo, Citgo, and Carco in the United States.[10]  (DE 112 at ¶ 13.)  Trigeant alleges that these commercial activities include, but are not limited to, the following:

- Petroleo and/or Citgo engaged in sales negotiations with Trigeant for the sale of Boscan crude.  This Boscan crude was to be shipped to the United States for use in the manufacture of Florida-spec asphalt to be sold in Florida.  (DE 112 at ¶ 13.)

- PDVSA's subsidiaries and agents sold Florida-spec asphalt to the Florida wholesale and retail markets.  (DE 112 at ¶ 13.)

- Petroleo and/or Citgo cut Trigeant off from its supply of Boscan crude.  (DE 112 at ¶ 13.)

- PDVSA's subsidiaries and agents set the price and quantity of Florida-spec asphalt sold by Carco in Florida so as to drive Trigeant from the manufacture and sale of Florida-spec asphalt.  (DE 112 at ¶ 13.)

- PDVSA's subsidiaries and agents monopolized the market for Florida-spec ashpalt.  (DE 112

---

[9] While Trigeant alleges these acts to be the "*direct* acts" of PDVSA, it simultaneously alleges that "Petroleo and/or Citgo—the parties responsible in name under the Trigeant Sales Agreement with supplying Boscan crude to Trigeant—were merely following PDVSA's directions and acting as its agents in the United States and Florida."  (DE 112 at ¶ 23.)

[10] According to Trigeant, "To the extent PDVSA's subsidiaries ever functioned autonomously, and not as agents controlled by PDVSA, that autonomy ceased in December 2002 when PDVSA's president was granted complete control over all PDVSA subsidiaries, at which time all directions and commands came from PDVSA." (DE 112 at ¶ 33.)

at ¶ 13.)

Accordingly, PDVSA has a direct principal-agent relationship with Petroleo, Citgo, and Carco, which are all PDVSA's agents. (DE 112 at ¶ 27-31.) Furthermore, Citgo is Petroleo's agent for commercial activities in the United States, and because Petroleo is PDVSA's agent, both Petroleo's and Citgo's illegal acts are attributable to PDVSA. (DE 112 at ¶ 28.) Carco is Citgo's agent, and because Citgo is PDVSA's agent, both Citgo's and Carco's illegal acts are attributable to PDVSA. (DE 112 at ¶ 30.)

Trigeant alleges the following facts/evidence in support of its theory that PDVSA and Petroleo have a principal-agent relationship:

- The PDVSA Shareholder Resolution manifests PDVSA's and Petroleo's consent to an agency relationship. (DE 112 at ¶ 38.)

- In March 2003, while the PDVSA Shareholder Resolution remained effective, Issa, who had been granted effective control of PDVSA, ordered Petroleo and Citgo not to ship Boscan crude to Trigeant. Petroleo and Citgo refused to sell Boscan crude to Trigeant in the United States at PDVSA's instruction. (DE 112 at ¶ 40.)

- Potential clients of Petroleo may fill out an application form and mail it to PDVSA's address. (DE 112 at ¶¶ 42-43.)

Trigeant alleges the following facts/evidence in support of its theory that Petroleo and Citgo have a principal-agent relationship:

- On February 24, 2003, Petroleo and Citgo entered into a Sales Representation Agreement, whereby Citgo would promote and obtain orders for sales of crude oil to customers and

11

prospective customers in the United States.[11]  (DE 112 at ¶ 45; DE 112 at Exhibit 7.)

Trigeant alleges the following facts/evidence in support of its theory that PDVSA and Citgo have a principal-agent relationship:

- The PDVSA Shareholder Resolution manifests PDVSA's and Citgo's consent to an agency relationship.  (DE 112 at ¶ 34.)

- PDVSA has long-term crude oil supply agreements with Citgo for a significant portion of Citgo's crude oil requirements.  (DE 112 at ¶ 35; DE 112 at Exhibit 3.)

- PDVSA controls the selection and replacement of Citgo's board members, some of which are or were employees of PDVSA.  (DE 112 at ¶ 36; DE 112 at Exhibit 2.)

Trigeant alleges the following facts/evidence in support of its theory that PDVSA and Carco, as well as Citgo and Carco have a principal-agent relationship:

- The PDVSA Shareholder Resolution manifests PDVSA's and Carco's consent to an agency relationship.  (DE 112 at ¶ 52.)

- The investment bank UBS prepared documents in 2006 for the sale of Carco; it described Carco's success as underpinned by reliable access to Venezuelan crudes. Trigeant alleges that these crudes were provided by PDVSA and its subsidiaries and agents.  (DE 112 at ¶ 52.)

- Turner, Mason & Company ("Turner") issued a similar report regarding Carco's reliance on PDVSA, stating that its asphalt sales have been dependent on the supply of Boscan crude. (DE 112 at ¶ 52.)

Trigeant alleges the following improper and anticompetitive conduct, by PDVSA on its own

---

[11] As the Court previously noted, the Agreement explicitly stated that it did not create a principal-agent relationship between Petroleo and Citgo.  (DE 112 at Exhibit 7.)

and through its agents, in furtherance of its attempts to monopolize or, alternatively, in abuse of its monopoly power:

- PDVSA and its agents engaged in four specific acts demonstrating a refusal to deal with Trigeant. (DE 112 at ¶ 93.) First, PDVSA had Petroleo and Citgo cancel the Trigeant Supply Agreement for Boscan crude, which was supposed to run from December 1, 2002 to November 30, 2003. (DE 112 at ¶ 93.) Second, PDVSA continually refused to allow Petroleo or Citgo to sell Boscan crude to Trigeant. (DE 112 at ¶ 93.) Third, PDVSA and its agents ordered third-party oil traders to prevent any spot sales of Boscan crude to Trigeant. (DE 112 at ¶ 93.) Fourth, PDVSA informed producers of substitute heavy crudes that they could charge a higher price to Trigeant because it could not count on any supply from PDVSA and its agents. (DE 112 at ¶ 93.) In summary, Trigeant alleges that "all attempts to purchase finished Florida-spec asphalt from PDVSA Petroleo, Carco, and other PDVSA agents met with either refusals to deal or with demands for uneconomic purchase prices." (DE 112 at ¶ 96.)

- PDVSA denied Trigeant access to Boscan crude, an essential facility to Trigeant. (DE 112 at ¶ 101.) Meanwhile, PDVSA had a sufficient supply of Boscan crude and continued to sell it to other purchasers at normal retail prices equaling a discount from the then-prevailing price of Maya. (DE 112 at ¶ 101.)

- PDVSA and its subsidiaries were able to sell Florida-spec asphalt at a price below Citgo/Carco's costs for purchasing such inputs for the production of Florida-spec asphalt. (DE 112 at ¶ 102.) The below-cost sales began around the time that PDVSA began to cut Trigeant off from its Boscan crude supply and continued until at least through March 2005,

when Trigeant EP Ltd. exited the market.  (DE 112 at ¶ 102.)  Afterwards, PDVSA and its

agents were able to set prices above competitive prices in order to recoup the investment in

earlier below-cost pricing.  (DE 112 at ¶ 102.)

•  The aforementioned actions, beginning in May 2003 and repeatedly pursued by PDVSA and

its agents through at least March 2005, also constituted an illegal price squeeze that forced

Trigeant out of the wholesale and retail market for Florida-spec asphalt.  (DE 112 at ¶ 105.)

Trigeant also alleges that PDVSA violated the duty of good faith, as established in paragraph

2 of Article 1.185 of the Venezuelan Civil Code.  (DE 112 at ¶ 108.)  Specifically, Trigeant

representatives met with PDVSA executives in Venezuela, where PDVSA executives assured

Trigeant that PDVSA would support Trigeant's purchase of a refinery in Chicksaw by having its

agents provide it with Boscan crude.  (DE 112 at ¶ 108.)  Trigeant alleges that PDVSA's assurances

falsely induced Trigeant to purchase the refinery and related distribution assets in March 2003. (DE

112 at ¶ 108.)

### D.     PDVSA's (Second) Motion to Dismiss (DE 119)

In its (Second) Motion to Dismiss, PDVSA incorporates the grounds raised in its first Motion

to Dismiss (see page 3 of this Order), focusing on this Court's lack of subject matter jurisdiction due

to Trigeant's failure to allege specific facts regarding any nexus between PDVSA's alleged direct acts

(or those of its subsidiaries that can allegedly be attributed to PDVSA via agency) in connection with

commercial activities, and Trigeant's claims.  (DE 119 at 1.)  Therefore, PDVSA claims that the CAE

to the FSIA can not be sustained.[12]  (DE 119 at 1-2.)

According to PDVSA, it is a foreign sovereign instrumentality that has established subsidiary companies with autonomy to make commercial decisions and enter into commercial agreements with third parties.  (DE 119 at 3.)  "Trigeant again attempts to conflate PDVSA with PDVSA Petroleo, Citgo, and Carco, because all alleged facts underlying the TAC concern interaction between Plaintiffs and those entities, and not between Plaintiffs and PDVSA."  (DE 119 at 3.)

According to PDVSA, all of the jurisdictional allegations in the TAC are ultimately founded on the December 2002 Emergency Shareholder Resolution that was adopted in Venezuela and gave "PDVSA's President, Ali Rodriguez Araque, broad short-term powers to deal with the crisis that followed a crippling work stoppage in Venezuela between December 2002 and March 2003."  (DE 119 at 5.)  Therefore, "plaintiffs' argument that the autonomy of PDVSA Petroleo, Citgo, and Carco ceased in December 2002, so that their separate corporate identities should thereafter be ignored for all purposes is without factual support."  (DE 119 at 6.)

PDVSA also claims that the Eleventh Circuit's decision in *Butler v. Sukhoi Co.,* 579 F.3d 1307 (11th Cir. 2009), forecloses Trigeant's agency argument.  (DE 119 at 7.)  PDVSA states that the TAC is at least as flawed as the *Butler* complaint in failing to allege specific facts sufficient to

---

[12] PDVSA claims that "Plaintiffs bear the burden to show that an exception to FSIA is applicable," citing *S & Davis Int'l Inc. v. Yemen,* 218 F.3d 1292, 1300 (11th Cir. 2000) in support of its description of the governing legal standard.  Such a description is incomplete.  "To establish subject matter jurisdiction under the FSIA, a plaintiff must overcome the presumption that the foreign state is immune from suit in the United States' courts. . . .  In order to overcome the presumption of immunity, a plaintiff must prove that the conduct which forms the basis of the complaint falls within one of the statutorily defined exceptions.  Once a party offers evidence that an exception to FSIA immunity applies, the party claiming immunity bears the burden of proving by a preponderance of the evidence that the exception does not apply."  *Id.* (internal citations omitted).

present a *prima facie* case that PDVSA is not entitled to FSIA immunity.  (DE 119 at 9.)  According to PDVSA, "There are no facts alleged to support any claim that PDVSA ceded its sovereign immunity under the FSIA by employing PDVSA Petroleo, Citgo and/or Carco as its agent to engage in specific conduct that amounted to 'commercial activity carried on in the United States by the foreign state.'" (DE 119 at 9.)  Additionally, there is no mention of any specific commercial activity carried out by PDVSA, directly or via agents, in the United States.  (DE 119 at 9.)

PDVSA argues, as before, that in "performing the sovereign function of executing Venezuelan energy policy, including deciding how to best exploit the country's national resources," it "is acting 'fundamentally' as a government, and is not subject to the commercial activity exception to the FSIA." (DE 119 at 10.)

PDVSA also argues that the TAC misstates the "direct effect" test of the third prong of the CAE: "The exception requires that an *act* in a foreign country in connection with a *commercial activity elsewhere*, where the act causes a direct effect in the United States." (DE 119 at 12-13.) Because Trigeant has alleged no facts to establish the existence of a commercial activity outside the United States, PDVSA argues that the TAC should be dismissed to the extent jurisdiction is based on activities that took place in Venezuela.  (DE 119 at 13.)

E.     **Trigeant's Response to PDVSA's (Second) Motion to Dismiss (DE 120)**

Trigeant responds that its jurisdictional allegations far exceed the basic pleading requirements under the Federal Rules and "are more than enough to give this Court FSIA jurisdiction over PDVSA." (DE 120 at 2.)  Should this Court conclude that more evidence is needed before it can assume jurisdiction over PDVSA, Trigeant requests leave to engage in discovery so that it can

uncover additional jurisdictional ties. (DE 120 at 2.)

Trigeant characterizes PDVSA's Motion as a "hodgepodge of arguments, none of which carry PDVSA's burden to prove that its anti-competitive acts fall outside the FSIA's commercial activity exception." (DE 120 at 3.)

Trigeant argues that PDVSA regularly engages in commercial activities of the kind covered by the FSIA's CAE, noting that the commercial character of an act is to be determined by reference to its nature rather than its purpose. (DE 120 at 6.) According to Trigeant, "PDVSA's involvement in negotiations with Trigeant regarding sales of Boscan crude, which included specific price and quantity discussions along with its efforts on its own and through its agents to monopolize Florida-spec asphalt sales, are exactly the types of actions engaged in by private parties." (DE 120 at 7.) In other words, Trigeant argues that these actions are commercial, falling under the CAE to the FSIA.

In regards to the "direct effect" test, Trigeant asserts that PDVSA's direct acts, originating in PDVSA's headquarters and involving commercial activity in Venezuela, had the "effect of furthering PDVSA's plans to monopolize the Florida-spec asphalt market while misleading Trigeant as to PDVSA's real intentions."[13] (DE 120 at 14.)

Trigeant further claims that the "act" under the CAE is not necessarily meant to be different from the referenced commercial activity because the FSIA defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act." (DE 120 at 14-15.)

_____

[13] Trigeant refers to the following direct acts: (1) PDVSA's order that Petroleo and Citgo cancel the Trigeant Supply Agreement; (2) PDVSA's order that third-party oil traders prevent any spot sales of Boscan crude to Trigeant; and (3) PDVSA's engagement in commercial discussions with Trigeant in Venezuela regarding the restoration of the flow of Boscan crude to Trigeant. (DE 120 at 14.)

17

In regards to agency, Trigeant asserts that the facts alleged in its TAC are sufficient to support either a finding of actual agency or apparent agency, which is recognized by the Eleventh Circuit.[14] (DE 120 at 8-9.)  In response to PDVSA's argument that Trigeant's agency allegations are inadequate because they are based on the short-term Emergency Shareholder Resolution, Trigeant argues that PDVSA has never offered a single piece of evidence that this resolution, which "made PDVSA responsible for all actions of its subsidiary companies including Citgo, Carco, and PDVSA Petroleo," expired in March 2003.  (DE 120 at 9.)  According to Trigeant, even if the Shareholder Resolution expired in March 2003, its agency argument is not precluded because it argued that PDVSA director Issa ordered that Trigeant's Boscan supply be cut off in approximately March 2003, while the Resolution remained effective.[15]  (DE 120 at 10.)

### F.    PDVSA's Reply in Support of (Second) Motion to Dismiss (DE 121)

PDVSA repeats that Trigeant's jurisdictional allegations are "conclusory or legally insignificant allegations ultimately based on Trigeant's misunderstanding of the December 8, 2002 PDVSA emergency shareholders' resolution and/or the February 2003 Sale[s] Representation Agreement between PDVSA Petroleo and a U.S. subsidiary." (DE 121 at 2.)  According to PDVSA,

---

[14] In terms of apparent agency, Trigeant argues that the state is bound by apparent authority where lack of authority is not so obvious to outside parties. "PDVSA makes no argument that there was an obvious lack of authority, nor can it, given that the employees and representatives of PDVSA's own subsidiaries told Trigeant that they were acting at the behest of PDVSA."  (DE 120 at 9.)

[15] Trigeant notes that it supports its agency allegations with more than just the Resolution, citing to: (1) specific statements by the employees and representatives of PDVSA and its subsidiaries; (2) additional agreements such as the 1986 twenty-year long-term crude supply agreement between PDVSA and Citgo; (3) conclusions of consultants' reports.  (DE 120 at 10.)

it is distinct from its subsidiaries, and there is no basis for attribution: neither the PDVSA emergency shareholders' resolution nor the Sale Representation Agreement between Petroleo and Citgo support Trigeant's agency theory.[16]  (DE 121 at 3.)

PDVSA also repeats that the alleged order to cease sales was an act in response to a national emergency (the work stoppage) and can only be classified as a sovereign, not commercial, act.  (DE 121 at 7.)  Additionally, for an effect to be direct in the United States, PDVSA argues that it must have no intervening element.  (DE 121 at 7.)  According to PDVSA, the alleged harm in this case is temporally and factually disconnected from the alleged acts.[17]  (DE 121 at 7.)

In regards to the alleged March 2003 order of PDVSA director Issa to cut Trigeant off from its supply of Boscan, PDVSA argues the following: (1) the order is fatally contradicted by the emergency shareholders' resolution that Trigeant relies upon; and (2) the order is insufficient to establish a material connection between Trigeant's cause of action and any conduct by PDVSA.  (DE 121 at 8.)

In regards to the meetings in Caracas, Venezuela between PDVSA executives and Trigeant officials, PDVSA argues the following: (1) the April and June 2003 meetings are not actionable under the FSIA because the CAE does not apply to claims for misrepresentation or interference with contractual rights; (2) the subsequent meetings regarding the resumption of Boscan crude supply were in the nature of settlement discussions; and (3) all of the meetings constitute unilateral acts by

---

[16] PDVSA asserts that the attribution standard applied under the FSIA is more rigorous than that involved in traditional agency analysis, citing cases that have applied the *Banec* control test to determine FSIA jurisdictional issues where the basis for the exception to immunity hinges on the alleged acts of the sovereign entity's agents.  (DE 121 at 4.)

[17] PDVSA states that the alleged acts of PDVSA reportedly occurred in late 2002 and early 2003, whereas Trigeant's asphalt business allegedly failed in 2008.

Trigeant that are insufficient, standing alone, to create a jurisdictional nexus between the acts of PDVSA and the United States.[18] (DE 121 at 9.)

Overall, PDVSA maintains that Trigeant has not overcome the presumption of immunity under the FSIA because it has not alleged specific facts that establish a material connection between Trigeant's cause of action and any alleged commercial activity by, or attributable to, PDVSA.

## II.    Legal Standard & Subject Matter Jurisdiction under the Foreign Sovereign Immunities Act

The Court must determine, as a threshold matter, whether it has subject matter jurisdiction over the claims at issue. *See, e.g., Filetech S.A. v. France Telecom S.A.*, 157 F.3d 922, 929 (2d Cir. 1998). The Foreign Sovereign Immunities Act ("FSIA") "provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993) (internal quotations omitted). The FSIA entitles foreign states to immunity from the jurisdiction of the courts in the United States, subject to certain enumerated statutory exceptions.[19] 28 U.S.C. §§ 1602-03, 1605. The Supreme Court has stated, "At the threshold of every action in a district court against a foreign state, . . . the court must satisfy itself that one of the exceptions applies, as subject-matter jurisdiction in any such actions depends on that application." *Republic of Austria v. Altmann*, 541 U.S. 677, 691 (2004) (internal quotations omitted). If the foreign state is

---

[18] PDVSA cites *S & Davis Int'l*, 218 F.3d 1292 (11th Cir. 2000), for the proposition that "The 'direct effect' component of the commercial activity exception to sovereign immunity 'is inextricably intertwined with the 'minimum contacts' component of the personal jurisdiction issue,' according to which jurisdiction cannot be based on the unilateral act of the party attempting to establish jurisdiction." (DE 121 at 9.)

[19] A "'foreign state' . . . includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state . . . ." 28 U.S.C. § 1603(a).

not entitled to immunity under one of the exceptions listed in 28 U.S.C. § 1605, then this Court has subject matter jurisdiction.[20] 28 U.S.C. § 1330. If there is subject matter jurisdiction, the Court also has personal jurisdiction over the foreign state. 28 U.S.C. § 1330. When a specified exception to immunity applies, the foreign state is liable in the same manner and to the same extent as a private individual under like circumstances. 28 U.S.C. § 1606.

Here, it is undisputed that PDVSA qualifies as an agency or instrumentality of a foreign state within the meaning of the FSIA and is thus presumptively immune from this Court's jurisdiction. Once the defendant shows that it is a foreign state or agency or instrumentality of a foreign state, the plaintiff must produce some facts to show that a statutory exception to immunity applies. *Arriba Ltd. v. Pemex*, 962 F.2d 528, 533 (5th Cir. 1992). "[T]he plaintiff must overcome the presumption that the foreign state is immune from suit by producing evidence that 'the conduct which forms the basis of [the] complaint falls within one of the statutorily defined exceptions.'" *Butler*, 579 F.3d at 1312-13 (quoting *S & Davis Int'l v. Yemen*, 218 F.3d 1292, 1300 (11th Cir. 2000)). Once plaintiff offers sufficient facts/evidence that an exception to FSIA immunity applies, the party claiming immunity bears the ultimate burden of proving, by a preponderance of the evidence, that the exception does not apply. *S & Davis Int'l*, 218 F.3d at 1300.

---

[20] Interestingly, Trigeant demands a jury trial in this action, which is not possible under 28 U.S.C. § 1330, the applicable jurisdictional statute. (DE 112 at 58.) The pertinent sections of 28 U.S.C. § 1330 provide:

(a) The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement.

(b) Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title.

Trigeant claims that the commercial activities exception ("CAE") to immunity applies to this Case.[21] Trigeant invokes two prongs of the CAE: the commercial activity carried on in the United States by PDVSA's agents and subsidiaries, and the commercial activities of PDVSA in Venezuela that have caused a direct effect in the United States. In regards to PDVSA's direct acts, the issue is whether Trigeant has overcome the presumption of immunity by producing sufficient facts/evidence that PDVSA's conduct, which forms the basis of its TAC, falls under the CAE to the FSIA. In regards to Trigeant's agency theory, the issue is whether Trigeant has overcome the presumption of immunity by producing sufficient facts/evidence that the conduct of parties other than PDVSA, which forms the basis of its TAC, falls under the CAE to the FSIA and can be attributed to PDVSA via agency. In its Motion, PDVSA attacked this Court's subject matter jurisdiction pursuant to the CAE to the FSIA; PDVSA argues that Trigeant has not overcome the presumption of PDVSA's immunity.

Attacks on subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) come in two forms: (1) "facial attacks" on the complaint require the court to accept its allegations and draw all reasonable inferences in favor of plaintiff to see if plaintiff has sufficiently alleged a basis for subject matter jurisdiction; and (2) "factual attacks," which challenge the existence of subject matter jurisdiction in fact, require that no presumption of truthfulness be attached to plaintiff's allegations and that matters outside the pleadings be considered. *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990). *See also Robinson v. Government of Malaysia*, 269 F.3d 133, 140 (2d Cir. 2001) ("In a motion to

---

[21] According to the CAE of the FSIA, "A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case – in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States."

dismiss pursuant to Fed. R. Civ. P. 12(b)(1), the defendant may challenge either the legal or factual

sufficiency of the plaintiff's assertions of jurisdiction, or both.") (internal citations omitted).

Generally, when a question of subject matter jurisdiction is raised, the Court may regard the

pleadings as mere evidence on the issue and may consider evidence outside the pleadings without

converting the proceeding to one for summary judgment.[22] *Velasco v. The Government of Indonesia,*

370 F.3d 392, 398 (4th Cir. 2004) (internal citations omitted). "Where the motion to dismiss is based

on a claim of foreign sovereign immunity, which provides protection from suit and not merely a

defense to liability, . . . the court must engage in sufficient pretrial factual and legal determinations

to satisfy itself of its authority to hear the case before trial." *Jungquist v. Sheikh Sultan Bin Khalifa*

*Al Nahyan,* 115 F.3d 1020, 1027-28 (D.C. Cir. 1997) (internal citations omitted). *See also Filetech,*

157 F.3d at 932 ("In view of the foregoing factual disputes, it was error for the district court to

accept the mere allegations of the complaint as a basis for finding subject matter jurisdiction. . . . In

these circumstances, the court should have looked outside the pleadings to the submissions, which

both contradicted and supported the bare allegations of jurisdiction pleaded in the complaint. . . .

[T]he district court should resolve the disputed factual matters by means of findings of fact.").

However, a district court is not required to defer ruling on a jurisdictional motion until all discovery

contemplated by the plaintiff has been accomplished. *Kelly v. Syria Shell Petroleum Dev. B.V.,* 213

F.3d 841, 855 (5th Cir. 2000).

It is important to note that a district court does not decide a case on the merits to decide

---

[22] The Court may base its disposition of a motion to dismiss for lack of subject matter
jurisdiction on: (1) the complaint alone; (2) the complaint supplemented by undisputed facts; or
(3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.
*Kelly v. Syria Shell Petroleum Dev. B.V.,* 213 F.3d 841, 845 (5th Cir. 2000).

whether it has jurisdiction: jurisdiction is not defeated by the possibility that plaintiff may have failed

to state a cause of action. *See, e.g., Robinson,* 269 F.3d at 141.

## III.   Analysis

### A.   The Commercial Activity Exception to the Foreign Sovereign Immunities Act: PDVSA's Direct Acts

According to the CAE of the FSIA, a foreign state is not immune in any case

> in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.[23]

28 U.S.C. § 1605(a)(2).  Under § 1605(a)(2), a plaintiff has to plead how the defendant achieved the

jurisdictional nexus (to the United States) necessary to support the district court's subject matter

jurisdiction.  *Arriba,* 962 F.2d at 534.  *See also S & Davis Int'l,* 218 F.3d at 1298 ("The 'direct

effects' component of the commercial activity exception to sovereign immunity is inextricably

intertwined with the 'minimum contacts' component of the personal jurisdiction issue.").  Further,

"[A] commercial activity with a sufficient jurisdictional nexus to the United States is not enough to

---

[23] Under the FSIA, "A 'commercial activity' means either a regular course of commercial conduct or a particular commercial transaction or act.  The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d).  Many courts have noted that this definition leaves the critical term "commercial" largely undefined. *See, e.g., Republic of Argentina v. Weltover,* 405 U.S. 607, 612 (1992).  Also, under the FSIA, "A 'commercial activity carried on in the United States by a foreign state' means commercial activity carried on by such state and having substantial contact with the United States." 28 U.S.C. § 1603(e).  The House Report describes "substantial contact" as including cases based on "commercial transactions performed in whole or in part in the United States" and "import-export transactions involving sales to, or purchases from, concerns in the United States," among others.  H.R. Rep. No. 94-1487, 94th Cong., 2d Sess., *reprinted in* 1976 U.S. Code Cong. & Admin. News 6604, 6615-16.

warrant an exception to immunity under the FSIA. There must also be a "material connection"
between the plaintiff's cause of action and the commercial acts of the foreign sovereign. *Arriba*, 962
F.2d at 533 ("The fact that Pemex has some commercial operations in or affecting the United States
is inadequate to support a finding of subject matter jurisdiction under the FSIA. The only relevant
acts for purposes of jurisdiction under the FSIA are those acts that form the basis of the plaintiff's
complaint.") (internal citations and quotations omitted).

Trigeant invokes the third prong of the CAE in its attempt to show that PDVSA is not
immune for its direct acts. Under the third prong of the CAE, Trigeant must produce evidence/plead
specific facts showing that its cause of action is "based upon" "an act outside the territory of the
United States in connection with a commercial activity of the foreign state elsewhere and that act
causes a direct effect in the United States."[24]  28 U.S.C. § 1605(a)(2).

According to the Supreme Court of the United States, "[T]he [Foreign Sovereign Immunities]
Act contains no definition of the phrase 'based upon.' . . . In denoting conduct that forms the 'basis,'
or 'foundation,' for a claim, the phrase is read most naturally to mean those elements of a claim, that,
if proven, would entitle a plaintiff to relief under his theory of the case." *Nelson*, 507 U.S. at 357
(internal citations and quotations omitted). *See also Santos v. Compagnie Nationale Air France*, 934
F.2d 890, 893 (7th Cir. 1991) ("An action is based upon the elements that prove the claim, no more

---

[24] In terms of the policy behind the FSIA and its exceptions, the court in *Callejo v.
Bancomer, S.A.*, stated: "By declining to exercise jurisdiction over foreign states where the
activities in question either are sovereign in nature or have an insufficient connection with the
United States, the United States recognizes that its interest in providing a forum for litigation by
aggrieved parties must often yield to the foreign state's interest in its independence. Where either
the foreign state's interest in independence is great or the United States's interest in asserting
jurisdiction is weak, the FSIA grants sovereign immunity in order to serve our larger interest in
preserving international amity." 764 F.2d 1101, 1112 (5th Cir. 1985).

and no less. If one of those elements consists of the commercial activity within the United States or other conduct specified in the Act, this country's courts have jurisdiction.").

In *Republic of Argentina v. Weltover*, the Supreme Court analyzed the third prong of the CAE; specifically, it had to determine whether (1) the cause of action was based upon an act that was taken "in connection with a commercial activity" of Argentina outside the United States; and (2) that "caused a direct effect in the United States." 504 U.S. at 611. In *Weltover*, the plaintiff claimed breach of contract based on Argentina's attempt to refinance its government-issued bonds ("Bonods") rather than pay them according to their terms. *Id.* It was undisputed that the cause of action was "based upon an act outside the territory of the United States": Argentina's unilateral extension of the time for payment. *Id.*

Generally, in cases where the plaintiff sues a foreign state (or an agency or instrumentality of a foreign state) for the act of directing or ordering another's commercial activity, courts have evaluated the claims under agency.[25] *See, e.g., Maritime Int'l Nominees Establishment v. Republic of Guinea*, 693 F.2d 1094, 1105 (D.C. Cir. 1982) ("We turn first to the District Court's conclusion that 'Guinea directed an American shipping group to perform substantial activities . . . .' An analysis of this finding must immediately confront the Act's requirement that the commercial activity be 'carried on by' the foreign state. . . . [I]n appropriate circumstances the activities of another may be attributed to the foreign state for purposes of the section 1605(a)(2) exception." (internal citations omitted)); *Baglab Ltd. v. Johnson Matthey Bankers Ltd.*, 665 F.Supp. 289, 293 (S.D.N.Y. 1987)

---

[25] The exception is where plaintiffs have alleged tortious interference with contract rights or business relations on behalf of the foreign sovereign or its agency or instrumentality. This category of claims, however, is absent from Trigeant's TAC and, in some circumstances, is specifically excluded from the scope of exceptions to the FSIA. *Carey v. National Oil Corp.*, 453 F.Supp. 1097, 1102 (S.D.N.Y. 1978) (citing 28 U.S.C. § 1605(a)(5)(B)).

26

("[T]he Court must determine whether subject matter jurisdiction exists over plaintiffs' claims against the Bank of England. To do so, the Court must decide the narrow issue of whether plaintiffs have sufficiently supported their contentions that the Bank of England personnel directed the decision not to loan funds to plaintiff and that the supervisory activities of the Bank of England with respect to JMB warrant looking beyond their separate juridical status to hold the Bank liable for the concededly commercial activities of JMB.").

In *Weltover*, it was undisputed that the extension of the bonds' payment schedules, the act at issue, was taken "in connection with" an alleged commercial activity: Argentina's issuance of the bonds. 504 U.S. at 612. According to the court in *Filetech*, "[a]cts are 'in connection' with . . . commercial activity so long as there is a 'substantive connection' or a 'causal link' between them and the commercial activity."[26] 157 F.3d at 939 (quoting *Hanil Bank. v. PT. Bank Negara Indonesia*, 148 F.3d 127, 130 (2d Cir. 1998)). *See also Samco Global Arms, Inc. v. Arita*, 395 F.3d 1212 (11th Cir. 2005) (holding that, in an action alleging breach of contract, the underlying contract constituted commercial activity, but its breach, the act upon which the cause of action was based, did not cause a direct effect in the United States); *Adler v. Federal Republic of Nigeria*, 107 F.3d 720, 724 (9th Cir. 1997) ("The 'commercial activity' prong of the third clause of § 1605(a)(2) requires us to make two distinct inquiries: (1) whether Nigeria engaged in a commercial activity; and (2) whether the acts complained of were made 'in connection with' that activity.") (holding that Nigeria engaged in commercial activity by entering the contract with the plaintiff, and that the plaintiff's suit was based

---

[26] Another court has noted that "The term 'in connection with' is not statutorily defined in the FSIA. When faced with a similar undefined term in the FSIA, the Supreme Court relied on the plain meaning of the term. The same tactic is appropriate here. The word 'connection' is defined as being 'related in a practical way' to another thing." *Dominican Energy Ltd., Inc., v. Dominican Republic*, 903 F.Supp. 1507, 1513 (M.D. Fla. 1995) (internal citations omitted).

on acts made "in connection with" that commercial activity, such as fraudulent inducement to enter the agreement and breach of the agreement).

In *Weltover*, the key question was whether Argentina's issuance of the bonds classified as a "commercial activity" under the FSIA.  504 U.S. at 611.  After explaining that the FSIA largely codified the "restrictive" theory of foreign sovereign immunity and that the restrictive theory of foreign sovereign immunity would not bar a suit based upon a foreign state's participation in the marketplace in the manner of a private citizen or corporation, the *Weltover* court concluded that "when a foreign government acts, not as a regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA."[27]  *Id.* at 612-14.  In concluding that Argentina's issuance of the bonds was a "commercial activity" under the FSIA, the Supreme Court stated that "it is irrelevant *why* Argentina participated in the bond market in the manner of a private actor; it matters only that it did so."  *Id.* at 617 (rejecting Argentina's argument that the bonds differed from ordinary debt instruments because they were created by the Government to fulfill its obligations under a foreign exchange program designed to address a domestic credit crisis).

In deciding whether Argentina's unilateral extension of the bonds' payment schedules had a

---

[27] "Moreover, because the Act provides that the commercial character of an act is to be determined by reference to its 'nature' rather than its 'purpose,' 28 U.S.C. § 1603(d), the question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives.  Rather the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in 'trade and traffic or commerce.'  Thus, a foreign government's issuance of regulations limiting foreign currency exchange is a sovereign activity, because such authoritative control of commerce cannot be exercised by a private party; whereas a contract to buy army boots or even bullets is a 'commercial' activity, because private companies can similarly use sales contracts to acquire goods."  *Weltover*, 504 U.S. at 614-15 (internal citations and quotations omitted).

"direct effect" in the United States, the Supreme Court held that an effect is direct if it follows "as an immediate consequence of the defendant's . . . activity." *Id.* at 617-18 (quoting *Weltover, Inc. v. Republic of Argentina*, 941 F.2d 145, 152 (2d Cir. 1991) (rejecting a suggestion in the legislative history of the FSIA that an effect is not "direct" unless it is both "substantial" and "foreseeable")). *See also United World Trade v. Mangyshlakneft Oil*, 33 F.3d 1232, 1238 (10th Cir. 1994) ("The requirement that an effect be 'direct' indicates that Congress did not intend to provide jurisdiction whenever the ripples caused by an overseas transaction manage eventually to reach the shores of the United States.").[28] The *Weltover* court concluded that the unilateral rescheduling had a direct effect in the United States because the plaintiff-respondents had designated their accounts in New York as the place of payment. 504 U.S. at 619. "Because New York was thus the place of performance for Argentina's ultimate contractual obligations, the rescheduling of those obligations necessarily had a 'direct effect' in the United States: Money that was supposed to be delivered to a New York bank for deposit was not forthcoming." *Id.*

As previously noted, the "direct effect" component of the CAE is related to the minimum contacts component of personal jurisdiction under a due process analysis. According to at least one court, contract negotiations, relating to a transaction that was never consummated, with a plaintiff that is domiciled and doing business in the United States, are not enough to establish the minimal contact (with the United States) sufficient to satisfy due process. *East Europe Domestic Int'l Sales*

---

[28] Other courts have noted that jurisdiction turns on how direct the loss/injury is rather than its size. *See, e.g., Filetech S.A. v. France Telecom S.A.*, 212 F.Supp.2d 183, 198 (S.D.N.Y. 2001) ("To extend jurisdiction brought by all persons indirectly injured by commercial acts of foreign states would subject them to the jurisdiction of United States courts in an enormously expanded number of cases (including, no doubt, many that would eventually be dismissed for failure to state a cause of action).").

*Corp. v. Terra*, 467 F.Supp. 383, 390 (S.D.N.Y. 1979) (dismissing plaintiff's complaint). According

to the *Terra* court,

> Cases construing the District Court of Columbia long-arm statute, on which section 1605
> is based, have held that negotiations without more are insufficient for an assertion of in
> personam jurisdiction. The court should undertake an analysis of the quality and nature of
> an activity in relation to a forum state to determine if the defendant has projected itself into
> the United States. . . . [T]he entire course of dealing between East Europe and Terra was
> by telex. It is undisputed that Terra initiated the transaction with its telex of March 24th.
> Had the deal materialized, Terra would have paid East Europe by cabling funds to plaintiff's
> New York bank. The rest of the transaction is located in Romania. . . . [W]e find that the
> March 24th telex does not constitute activity having a 'direct effect' in the marketplace of
> the United States; it is an insufficient factor upon which to confer jurisdiction.

467 F.Supp. at 388-90 (internal quotations and citations omitted).

To summarize, in arguing that PDVSA's direct acts fall under the third prong of the CAE,

Trigeant must show the following: 1) a cause of action that is based upon, or materially connected

to, PDVSA's act(s) outside the United States; 2) the act(s) was/were in connection with PDVSA's

commercial activity; and 3) the act(s) caused a direct effect, or immediate consequence, in the United

States.

Trigeant has not overcome the presumption of immunity by producing sufficient facts showing

that PDVSA's conduct, which forms the basis of its TAC, falls under the CAE to the FSIA.

Although Trigeant alleged various "direct acts"/"commercial activities" by PDVSA, each one of these

fails to satisfy the CAE.[29]

First, Trigeant does not show how PDVSA's long-term oil supply agreements with Citgo are

materially connected to any of its claims. As the Court has stated in its previous Order Granting

---

[29] Trigeant appears to freely interchange "direct act" and "commercial activity." For
example, under the "PDVSA's Direct Acts" section of the TAC, Trigeant writes that "PDVSA
has a long history of engaging in commercial activities within, or with a direct effect upon, the
United States." (DE 112 at ¶ 14.)

PDVSA's (first) Motion to Dismiss, an act with a jurisdictional nexus to the United States is insufficient to warrant application of the CAE; the cause of action must be based upon that act.

Second, Trigeant uses the Shareholder Resolution as one of PDVSA's direct acts in support of the CAE. Trigeant has not shown how the Shareholder Resolution is materially connected to any of its claims relating to PDVSA's *direct* acts. The Shareholder Resolution is only relevant to the extent that it can be used to argue that an agency relationship existed between PDVSA and its subsidiaries. In arguing that the Court should assume jurisdiction over PDVSA for the acts of its subsidiaries and alleged agents, Trigeant does continuously invoke the Shareholder Resolution. To the extent that Trigeant utilizes a semantic ploy to recast one act, the passage of the Shareholder Resolution, as supporting the CAE both via PDVSA's direct acts and via agency, such a recasting has not gone unnoticed. Trigeant should not be able to characterize the same act in two different ways to overcome the presumption of immunity: the Shareholder Resolution will be considered by the Court in its evaluation of whether Trigeant has shown that PDVSA had a principal-agent relationship with its subsidiaries while they undertook the commercial activities that form the basis of Trigeant's claims. As previously discussed, such treatment is consistent with how previous courts have dealt with such allegations.

Third, Trigeant argues that Issa's order that Petroleo and Citgo refuse shipment of Boscan crude to Trigeant constitutes commercial activity in the United States or with a direct effect in the United States. Trigeant submits that Issa issued the order as effective head of PDVSA, but that it was carried out by Trigeant's agents and subsidiaries, Petroleo and Citgo. (DE 112 at ¶ 18.) As with the Shareholder Resolution, using this as PDVSA's direct act to support the application of the CAE is flawed. Trigeant utilizes the same semantic ploy with this act as with the Shareholder Resolution:

31

it invokes Petroleo's and Citgo's refusal to ship Boscan crude to Trigeant as commercial activity falling under the CAE and attributable to PDVSA via agency. That is how the Court will evaluate it.[30]

As PDVSA correctly points out, the act of instructing or ordering a subsidiary not to sell Boscan crude to Trigeant may be the basis of a cause of action for interference with contract rights or business relations, a claim that is not alleged by Trigeant. A look at Trigeant's allegations of PDVSA's anticompetitive conduct reveals that PDVSA's direct acts are generally not at issue. Rather, the actions of others, allegedly ordered by PDVSA, form the basis of Trigeant's antitrust complaint. PDVSA can only be responsible for these via an agency relationship. For example, under the "Refusal to deal" section, Trigeant claims that PDVSA and its agents engaged in four specific acts demonstrating a refusal to deal: 1) PDVSA had Petroleo and Citgo cancel the Trigeant Supply Agreement; 2) PDVSA did not allow Petroleo and Citgo to resume selling Boscan crude to Trigeant; 3) PDVSA ordered third-party traders not to sell Boscan crude to Trigeant; and 4) PDVSA informed other producers that they could charge Trigeant a higher price. (DE 112 at ¶ 93.) None of these alleged anticompetitive acts are PDVSA's *direct* acts: PDVSA can only be responsible for the alleged orders and requests to others to act anti-competitively if the CAE applies to them and an agency relationship is established between PDVSA and each party that undertook the alleged anticompetitive conduct.

One possible act/set of acts, which may support the application of the CAE to PDVSA

---

[30] Additionally, as to a direct effect pursuant to the CAE, the Issa order had none. The alleged breach of the Trigeant Supply Agreement by Petroleo and Citgo and the subsequent failure to deliver Boscan crude to Trigeant are the relevant acts. Various causes of action are based on these acts; the alleged loss of profits and the anticompetitive effect on the market are the alleged direct effects of these acts.

directly, remains: the meetings between PDVSA representatives and Trigeant representatives in Caracas, Venezuela. Even accepting Trigeant's allegations regarding the substance of the meetings, which is disputed by PDVSA, the meetings can not be a proper foundation for applying the CAE to PDVSA directly for various reasons.[31]

Trigeant's antitrust claims are not based on these failed meetings: there is no material connection between the meetings and the claims. The meetings occurred after Petroleo and Citgo, allegedly upon PDVSA's order, stopped shipping Boscan crude to Trigeant. Trigeant alleges it discussed, with PDVSA representatives, the possible resumption of Boscan crude shipments. Trigeant's claims are based on the following anticompetitive conduct: refusal to deal, denial of an essential facility, predatory pricing, and an illegal price squeeze. The claims are based, in large part, on the cancellation of the shipments, not on the subsequent meetings.

This takes us to the "direct effect" requirement of the CAE.[32] The direct effect, or immediate consequence, of the meetings consisted of a perpetuation of the status quo: Trigeant continued to receive no Boscan crude shipments. The direct effect, if any, of the cancellation of the Trigeant Supply Agreement was felt after the cancellation and as a result of it. The post-cancellation meetings did not alter the status quo post-cancellation; they had the same effect as if simply nothing had

---

[31] Trigeant claims that the meetings related to the possible restoration of Boscan crude sales to Trigeant and were ultimately unsuccessful: PDVSA did not allow Petroleo and Citgo to resume sales under the Trigeant Supply Agreement.

[32] As previously noted, the direct effect test is related to the inquiry into personal jurisdiction under due process. At least one court has held that contract negotiations, relating to a transaction that was never consummated, are not enough to establish the minimum contacts with the United States sufficient to satisfy due process. *Terra*, 467 F.Supp. at 390. The Supreme Court has assumed, without deciding, that a foreign state is a "person" for purposes of the due process clause, although States of the Union are not "persons" for the purposes of the due process clause. *Weltover*, 504 U.S. at 619.

happened.

In conclusion, none of PDVSA's alleged direct acts sufficiently show that the CAE is applicable: Trigeant has not overcome the presumption of PDVSA's immunity by producing sufficient facts/evidence that PDVSA's conduct, which forms the basis of its TAC, falls under the CAE to the FSIA.[33]  PDVSA is thus immune: this Courts lacks subject matter and personal jurisdiction for claims based on its acts.  All counts contained in the TAC, inasmuch as they relate to PDVSA's *direct* acts, are dismissed with prejudice for lack of subject matter jurisdiction.

### B.   The Commercial Activities Exception to the Foreign Sovereign Immunities Act: Acts Attributed to PDVSA via Agency

It is a well-established principle that the activities of an agent may be attributed to the principal for jurisdictional purposes.  *See, e.g., Terra*, 467 F.Supp. at 390.  At issue is whether Trigeant has overcome the presumption of immunity by producing some facts/evidence that the alleged agents' conduct, which forms the basis of the TAC, falls under the CAE to the FSIA and can be attributed to PDVSA via an agency relationship.  *See, e.g., Transamerica Leasing v. La Republica de Venezuela*, 200 F.3d 843, 850 (D.C. Cir. 2000) ("That a state and a state-owned corporation may

---

[33] The Court would like to specifically address Count IX of the TAC, which is based on a violation of PDVSA's duty of good faith under the Venezuelan Civil Code.  The claim is based on PDVSA's assurance to Trigeant, in Venezuela, that it would support Trigeant's purchase of a refinery in the United States by providing it with Boscan crude through its agents and subsidiaries. Trigeant did not include the direct act underlying this claim in its "Direct Acts" section of the TAC.  Regardless, the CAE is not satisfied as to this claim because Trigeant has not pled PDVSA's commercial activity that is connected to this act.  Also, although Trigeant pleads damages, including loss of expected profits, these can hardly constitute a direct effect in the United States of PDVSA's assurance to Trigeant that it would provide it with Boscan crude through its agents.  Further, even if the CAE applied to this claim, it is most likely that the Court would refuse to adjudicate it due to international comity principles.  *See, e.g., In re Air Cargo Shipping Servs. Anti-trust Litig.*, 2008 WL 5958061, at *33-34 (E.D.N.Y. Sept. 26, 2008).

in some circumstances be, respectively, principal and agent does not necessarily mean, however, that in those circumstances the sovereign is amenable to a suit based upon the acts of the agent. For example 'jurisdiction [over the sovereign] cannot be maintained if the agent's actions are not related to the substance of plaintiff's cause of action.'") (quoting *Gilson v. Republic of Ireland*, 682 F.2d 1022, 1029-30 (D.C. Cir. 1982)); *Baglab*, 665 F.Supp. at 294 ("In evaluating a claim of immunity under the FSIA, courts must first define with precision the activity or the act in connection with that activity that gives rise to plaintiff's claims.").

The standard for determining whether the CAE applies was set out above. The Court must also decide which standard applies to the determination of an agency relationship at the jurisdictional stage. The parties have not provided an illuminating discussion on this issue. Trigeant argues that its allegations of agency far exceed the pleading requirements under the Federal Rules and are sufficient to support a finding of agency for purposes of the FSIA. However, Trigeant has not specified what is "sufficient" for purposes of establishing agency in this context. On the other hand, PDVSA, while arguing that Trigeant failed to make a *prima facie* case of agency, attacked the substance of Trigeant's arguments in support of its agency theory, most notably the Shareholder Resolution.[34] In arguing that the attribution standard under the FSIA is more rigorous than that

---

[34] In arguing that Trigeant failed to allege a *prima facie* case of agency, PDVSA's reliance on *Butler* is unavailing. 579 F.3d 1307. In *Butler*, the complaint failed to allege an FSIA statutory exception to sovereign immunity that could be subjected to verification through discovery; an alter-ego relationship was the only conduct alleged in the complaint *Id.* at 1313-14. The *Butler* court concluded that even if it had accepted the alter-ego allegations as true, they would be insufficient as a matter of law to demonstrate the existence of subject matter jurisdiction because they wouldn't bring the claim within one of the statutorily enumerated exceptions to FSIA immunity. *Id.* at 1312-1313. This Case is easily distinguishable from *Butler*. For example, in the beginning of the TAC, Trigeant alleges that "PDVSA is not entitled to sovereign immunity and is subject to the jurisdiction of this Court because PDVSA has engaged in commercial activities in the United States through its subsidiaries and agents PDVSA Petroleo, Citgo, and Carco." (DE

involved in traditional agency analysis, PDVSA invokes the *Banec* control test. *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983) (hereinafter *Banec*).

*Banec* is the seminal Supreme Court case on this issue; it is cited by almost all subsequent courts that have had to determine whether the commercial activity of an alleged agent may be attributed to an alleged principal that benefits from the presumption of immunity under the FSIA.[35] In *Banec*, the Supreme Court held that duly created government instrumentalities are presumed to be independent from the sovereign that created them and independent from each other. 462 U.S. at 627-28. The Supreme Court found support for this holding in the legislative history of the FSIA, citing to a House Report that stated: "If U.S. law did not respect the separate juridical identities of different agencies or instrumentalities, it might encourage foreign jurisdictions to disregard the juridical divisions between different U.S. corporations or between a U.S. corporation and its independent subsidiary." *Id.* at 628 (internal quotation and citation omitted).

The *Banec* court also held that federal common law and international law governed the determination of whether the instrumentality could be held liable for actions taken by the sovereign.[36] *Id.* at 623. After outlining the features it attributed to an ordinary, independent government

---

112 at ¶ 13.) Trigeant goes on to describe the alleged commercial activities. Further, PDVSA argues, throughout its submissions, that Trigeant has not pled sufficient facts to support the CAE. PDVSA can not simultaneously argue that no statutory exception to immunity was *alleged* and counter an alleged exception.

[35] In *Banec*, the Cuban government expropriated First National City Bank's property. Based on the government expropriation, the bank asserted a set-off against the claim of the plaintiff, Banec, Cuba's state-owned banking entity. The issue was whether the acts and liabilities of Cuba could be attributed to Banec, an agency or instrumentality of a foreign state under the FSIA.

[36] The *Banec* court specifically declined to apply the law of the chartering state to determine the separate juridical status of its instrumentality. 462 U.S. at 621-22.

instrumentality, the court explained two scenarios where the presumption of independence could be overcome.[37]   First, "where a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created, . . . one may be held liable for the actions of the other." *Id.* at 629.   Second, the corporate form may be disregarded where it is used to defeat legislative policies; in other words, when recognizing it would work fraud or injustice.   *Id.* at 629-30.

Although the *Banec* court's description of the bases for disregarding the separate juridical status of a foreign instrumentality occurred in the discussion of substantive liability, its principles have subsequently been applied to FSIA jurisdictional issues.   *See, e.g., Arriba,* 962 F.2d at 533-34; *Transamerica Leasing,* 200 F.3d at 848 ("Although the Supreme Court in *Banec* recognized these as exceptions to the rule that a foreign sovereign is not liable for the acts of an instrumentality of the state, we have since held that they serve also as exceptions to the rule that a foreign sovereign is not amenable to suit based upon the acts of such an instrumentality.").

Thus, *Banec* creates an exception to the general rule that the defendant retains the ultimate burden of proof on immunity under the FSIA once plaintiff produces some facts to show that an exception to immunity applies.   Under *Banec,* when jurisdiction also hinges on an allegation of agency, the plaintiff bears the burden of overcoming the presumption of independence and proving the agency relationship. *Arriba,* 962 F.2d at 533-34.  *See also Hester Int'l Corp. v. Federal Republic of Nigeria,* 879 F.2d 170, 176 (5th Cir. 1989) ("HIC [the plaintiff] bears the burden of proving the agency relationship, which would allow NGPC [the alleged agent and defendant] to bind Nigeria [the alleged principal and defendant] to the Agreement. . . . If we were determining whether the

---

[37] The *Banec* court recognized that it was not creating an exhaustive list of criteria for disregarding the corporate form.   The Court noted that the applicable inquiry is fact-specific, defying resolution via a mechanical formula.   462 U.S. at 633.

commercial exception applied, the reverse would be true; Nigeria would bear the burden of proving that its action was not commercial.")

Although *Banec* dealt with the characterization of the relationship between a foreign sovereign and its instrumentality/agency, other courts have applied its standard to characterizing the relationship between a foreign sovereign's instrumentality/agency and that instrumentality's/agency's corporate subsidiary.[38] *See, e.g., Gabay v. Mostazafan Found. of Iran*, 151 F.R.D. 250 (S.D.N.Y. 1993); *Baglab*, 665 F.Supp. 289. In other words, courts have applied *Banec* while acknowledging that the alleged agent in the principal-agent relationship was not considered an "agency or instrumentality" of a foreign sovereign under section 1603 of the FSIA.[39] *Gabay*, 151 F.R.D. at 257.

In line with what other courts have done, this Court will apply the *Banec* standard to Trigeant's agency allegations. Courts that have applied *Banec* to the FSIA jurisdictional context have stated that the level of control by the alleged principal over the alleged agent was the key to determining the applicability of the agency exception to the presumption of sovereign immunity. *See, e.g., Transamerica Leasing*, 200 F.3d at 848 ("Our previous decisions applying the agency exception to the rule of sovereign immunity have generally focused upon how much control the sovereign exercised over the instrumentality, without explicating why and the circumstances in which control is relevant to the question of the sovereign's amenability to suit."); *Heroth v. Kingdom of Saudi Arabia*, 565 F.Supp.2d 59, 66 (D.D.C. 2008) ("Plaintiffs argue that Defendants engaged in

---

[38] As noted above, the *Banec* court's citation to the legislative history of the FSIA, with its reference to U.S. corporations and their subsidiaries, lends support to such an approach.

[39] The Supreme Court has held that a subsidiary of an instrumentality is not itself entitled to instrumentality status under the FSIA: only direct ownership of a majority of shares by the foreign state grants the subsidiary such status and the ensuing FSIA protection. *Dole Food Co. v. Patrickson*, 538 U.S. 468, 473-74 (2003).

commercial activity in the United States when their 'agent,' Vinnell, recruited its employees in the

United States.  To succeed on this theory, Plaintiffs must prove an agency relationship existed

between Vinnell and Defendants. . . . In this case, there is no conceivable agency relationship between

Vinnell and Defendants. . . . [T]here is no indication that Defendants authorized Vinnell to recruit

employees in the United States or that Defendants had the right to control the conduct of Vinnell with

respect to its recruitment of employees.").

In *Transamerica Leasing*, the court engaged in an extensive discussion of the two distinct

contexts where control by the sovereign is relevant to the applicability of the agency exception to the

presumption of sovereign immunity.  First, control is relevant when:

> it significantly exceeds the normal supervisory control exercised by any corporate parent
> over its subsidiary and, indeed, amounts to complete domination of the subsidiary.  A
> sovereign is amenable to suit based upon the actions of an instrumentality it dominates
> because the sovereign and the instrumentality are in those circumstances not meaningfully
> distinct entities; they act as one. . . . Thus, if one corporation is operated as a division of
> another, then the latter may be held responsible for the acts of the former.

200 F.3d at 848 (internal citation and quotation omitted).  Second, control is relevant when:

> the sovereign exercises its control in such a way as to make the instrumentality its agent; in
> that case control renders the sovereign amenable to suit under ordinary agency principles.
> The relationship of principal and agent depends, however, upon the principal having the
> right to control the conduct of the agent with respect to matters entrusted to the agent.  A
> sovereign does not create an agency relationship merely by owning a majority of a
> corporation's stock or by appointing its Board of Directors.  If majority stock ownership
> and appointment of the board of directors were sufficient, then the presumption of
> separateness announced in *Banec* would be an illusion.  At the same time, a sovereign need
> not exercise complete dominion over an instrumentality—to the point of stripping it of any
> meaningful separate identity—in order to establish a relationship of principal and agent.  If
> such dominion were required, then agency principles would be superfluous because, as
> discussed above, the sovereign would be subject to suit on the ground that instrumentality
> and sovereign were in fact a single entity.  Courts have long struggled, often with confusing
> results, to explain how much control is required before parent and subsidiary may be deemed
> principal and agent. . . . At a minimum, however, we can confidently state that the
> relationship of principal and agent does not obtain unless the parent has manifested its desire

39

for the subsidiary to act upon the parent's behalf, the subsidiary has consented so to act, the parent has the right to exercise control over the subsidiary with respect to matters entrusted to the subsidiary, and the parent exercises its control in a manner more direct than by voting a majority of the stock in the subsidiary or making appointments to the subsidiary's Board of Directors.

*Id.* at 849.

In *Transamerica Leasing*, the district court denied Venezuela's (the defendant's) motion to dismiss for lack of subject matter jurisdiction, finding that Venezeula and CAVN, a state-owned instrumentality, had a principal-agent relationship.[40] *Id.* at 847. The Court of Appeals concluded that "plaintiffs, whether understood to contend that Venezuela so dominated CAVN that the corporation lacked a distinct identity, or merely that CAVN acted as the Government's agent, have failed to demonstrate that Venezuela controlled CAVN to a degree sufficient to render the State amenable to suit based upon the actions of the corporation." *Id.* at 850. According to the Court of Appeals, the fact that the Government owned CAVN's stock and appointed its Board of Directors was relevant but, as a matter of law, insufficient to establish the requisite control. *Id.* at 851. Furthermore, the remaining factors did not make up the shortfall. *Id.* More specifically, the Government's purported role in CAVN's "day-to-day operations" was actually nothing more than the sole shareholder exercising its influence, through the Board of Directors, to put its own chosen manager in charge of a corporation and leaving to him the task of running "day-to-day" operations. As to the infusion of

---

[40] The district court decided the motion to dismiss based on the pleadings and evidence submitted supporting and opposing the motion. It focused upon five facts that led it to attribute the actions of CAVN (its breaches of contract) to the Government: Venezuela (1) owned a majority of CAVN's stock; (2) appointed the Board of Directors and the Chairman of the Board and President; (3) was involved in CAVN's "day-to-day" operations by overseeing the restructuring of CAVN's intermodal operations and approving the sale of three of CAVN's vessels; and (4) aided CAVN financially; while (5) the President of CAVN, with apparent authority to bind Venezuela, assured one of the plaintiffs that the Government would support CAVN. *Transamerica Leasing*, 200 F.3d at 850.

state capital to cover CAVN's losses,  that "was a normal aspect of the relation between a

government and a government-owned corporation, not an instance of 'day-to-day' involvement in

the affairs of the corporation." *Id.* at 852.  Accordingly,

> Taken together, the district court's findings do not show that Venezuela controlled CAVN
> in a manner sufficient to forfeit its immunity under the FSIA. . . . [W]e remain unconvinced
> that Venezuela exercised such control over CAVN as to make the Government amenable
> to suit based upon CAVN's actions under the principal and agent exception announced in
> *Banec*. . . . Venezuela did not evince an intent to have CAVN act as its agent in dealing with
> the plaintiffs. No one at CAVN sought the Government's approval for routine business
> decisions.[41]

*Id.* at 852-53.

    While the *Transamerica Leasing* court dealt with an allegation of a principal-agent

relationship between a sovereign and its instrumentality, the *Gabay* court dealt with an allegation of

a principal-agent relationship between a government instrumentality, the Iranian Foundation, and a

non-profit corporation incorporated under New York law, the New York Foundation.[42]  151 F.R.D.

250.  In *Gabay*, the plaintiff sued both the Iranian Foundation and the New York Foundation, alleging

that the New York Foundation had been under the control of the Iranian Foundation such that the

commercial activity of the New York Foundation could be attributed to the Iranian Foundation for

jurisdictional purposes. *Id.* at 252.  The plaintiff invoked *Banec*'s first ground for overcoming the

presumption of the New York and Iranian Foundation's independence: the existence of a principal-

---

    [41] The Court of Appeals also rejected the plaintiffs' apparent authority argument because
Venezuela had not indicated to the plaintiffs that CAVN could act as its agent. *Transamerica
Leasing*, 200 F.3d at 853.

    [42] It was undisputed that the Iranian Foundation was an "agency or instrumentality" of the
Iranian government within the meaning of the FSIA. *Gabay*, 151 F.R.D. at 252.  The New York
Foundation was excluded from the definition of an "agency or instrumentality" of a foreign
sovereign by § 1603(b)(3) because it was incorporated under the laws of the State of New York,
and New York was its principal place of business. *Id.* at 257.

agent relationship. *Id.* at 254. "[C]ourts applying the principal/agent prong of the *Banec* test have required the party seeking to overcome the presumption of separateness to show that the alleged principal exercises 'general control over the day-to-day activities' of its alleged agent." *Id.* (quoting *Baglab*, 665 F.Supp. at 297). The *Gabay* court recognized that a showing of direct control is highly fact-dependent; in light of the factual dispute underlying the issue of jurisdiction in the case, it first considered whether plaintiff's claim was insufficient as a matter of law.[43] *Id.* It held that plaintiff's claim was not so legally insufficient that he was precluded from discovery as a matter of law. *Id.* at 255.

> Here, plaintiff has done more than make conclusory allegations that the New York Foundation is the Iranian Foundation's agent. He has offered an array of documents that, taken together, provide support for the following claims: that the Iranian Foundation claims to have 'taken over' the management of the New York Foundation in 1979; that the Iranian foundation closely controlled or supervised the New York Foundation; and that the New York Foundation has used its funds in a way that violated its corporate charter, possibly commingling them with those of the Iranian Foundation. Although these documents by themselves are legally insufficient to overcome the presumption of the New York Foundation's independence, and although many of plaintiff's supporting documents—which include newspaper articles, publications by the Iranian Foundation, and a complaint filed by a former employee of the New York Foundation, later withdrawn—do not constitute evidence admissible at trial, they suggest that admissible evidence might well be obtained if discovery were permitted. Thus they are sufficient to convince the court that dismissal of plaintiff's claim without discovery on the 'alter ego' issue would be premature.

*Id.* at 256-57 (internal citations omitted). For these reasons, the court denied defendants' motion to dismiss without prejudice and allowed jurisdictional discovery. *Id.* at 258.

In this Case, Trigeant's claim that Carco is an agent of Citgo and PDVSA is legally insufficient; Trigeant is precluded from discovery on this issue. Trigeant stated the following in

---

[43] The defendants contended that plaintiff's allegations of a principal-agent relationship were insufficient as a matter of law and that the two foundations were separate entities such that the activity of the New York Foundation could not be attributed to the Iranian Foundation for purposes of FSIA jurisdiction.

support of its argument that Carco is an agent of PDVSA and Citgo and that PDVSA and Citgo exert substantial control over Carco: the PDVSA Shareholder Resolution; a UBS report describing Carco's success as underpinned by reliable access to Venezuelan crudes, allegedly provided by PDVSA and its subsidiaries and agents; and a Turner report describing Carco's asphalt sales as dependent on the supply of Boscan crude. (DE 112 at ¶ 52.) Even if these allegations are accepted as true, they do not satisfy the *Banec* control test. First, the Shareholder Resolution applies to PDVSA's direct subsidiaries, such as Citgo and Petroleo, not its indirect subsidiaries. Even if PDVSA controlled Citgo via the Shareholder Resolution, it would still have a parent-subsidiary relationship with Carco, which was a subsidiary of Citgo. The law is clear: the fact that a parent company owns stock of a subsidiary company and appoints its Board of Directs is relevant but, as a matter of law, insufficient to establish an agency relationship under *Banec*. Similarly, the fact that Carco was a wholly-owned subsidiary of Citgo is, as a matter of law, insufficient to establish an agency relationship between the two entities. Trigeant's remaining factors do not establish the kind of control that is relevant in determining whether there is an agency relationship. The UBS and Turner reports referenced Carco's reliance, as an asphalt refiner, on the supply of Venezuelan crudes, allegedly provided by PDVSA and its other subsidiaries and agents. (DE 112 at ¶ 52.) While the reports may indicate that Carco was dependent on PDVSA's supply of crude oil, this in no way indicates that Carco was an agent of PDVSA or its other subsidiaries and agents. There is no indication that Carco's day-to-day activities were controlled by PDVSA or Citgo. There is no indication that PDVSA or Citgo directed Carco to engage in any specific acts that fall under the CAE to the FSIA and can be attributed to PDVSA via an agency relationship. Conclusory allegations of control are insufficient. Therefore, all counts, as they relate to Carco's commercial activities, are dismissed with prejudice for lack of subject matter

jurisdiction.

As with the SAC, the TAC lacks specificity. Most of the anticompetitive conduct alleged in the TAC is attributed generally to "PDVSA and its agents" rather than to a specific agent(s) by name. For example, under the "Essential facility" section, Trigeant alleges that "Venezuela is the only source for Boscan, and PDVSA along with PDVSA's agents have maintained exclusive control over the supply . . . . Trigeant could only obtain Boscan from PDVSA and its agents." (DE 112 at ¶ 100.) Under the "Predatory Pricing and/or Primary-Line Competitive Injury" section, Trigeant states that "PDVSA and its subsidiaries were able to sell Florida-spec asphalt on the Wholesale Market at a price below Citgo/Carco's costs for purchasing such inputs for the production of Florida-spec asphalt." (DE 112 at ¶ 102.) It is not clear that Carco is excluded from this group (of PDVSA's subsidiaries) even though it was not PDVSA's direct subsidiary since Trigeant previously stated that "Carco was one of these 'subsidiary companies' whose corporate powers, functions and levels of authority were directly managed by PDVSA" pursuant to the Shareholder Resolution. (DE 112 at ¶ 52.) Furthermore, Trigeant's "Violations Alleged" section, which describes the counts in the TAC, consistently refers to the actions of "PDVSA and its agents" and does not identify the agent(s) by name.[44] (DE 112 at ¶¶ 109-190.)

In the context of the FSIA, Trigeant's pleading is problematic. This Court is dismissing all counts as they relate to the commercial activities of Carco (an alleged agent). However, the Court can not determine which counts and anticompetitive activities relate to Carco as opposed to the other alleged agents, Petroleo and Citgo. As the Court has stated, at issue is whether Trigeant has

---

[44] Count IX, which alleges a violation under the Venezuelan Civil Code, is the only count that refers to the actions of "PDVSA" rather than "PDVSA and its agents." (DE 112 at ¶¶ 191-197.)

overcome the presumption of PDVSA's immunity by producing some facts/evidence that the alleged agents' conduct, which forms the basis of the TAC, falls under the CAE to the FSIA and can be attributed to PDVSA via an agency relationship.  Based on the TAC, this Court can not evaluate whether Trigeant has overcome the presumption of immunity via the allegations of a principal-agent relationship between PDVSA and Citgo and PDVSA and Petroleo because it can not determine which counts and anticompetitive activities are attributed to Citgo and/or Petroleo as opposed to Carco. The Court must be able to determine subject matter jurisdiction as to each count, but it can not do so based on the information provided in the TAC.  Therefore, the Court is granting PDVSA's Motion and dismissing all claims, without prejudice, as they relate to Petroleo's and Citgo's commercial activities.  Trigeant will have one *final* opportunity to allege *specific* facts that, if proved through jurisdictional discovery, would allow the Court to attribute the commercial activities of Petroleo and Citgo, which form the basis of Trigeant's Complaint, to PDVSA via an agency relationship.

## III.   Conclusion

Accordingly, it is hereby **ORDERED AND ADJUDGED** that:

(1) Defendant's (Second) Motion to Dismiss Plaintiffs' Third Amended Complaint (DE 119) be **GRANTED WITH PREJUDICE** as to all counts relating to PDVSA's direct acts and Carco's commercial activities that were alleged against PDVSA via agency; and **GRANTED WITHOUT PREJUDICE** as to all counts relating to Petroleo's and Citgo's commercial activities that were alleged against PDVSA via agency, with leave to amend the Complaint within ten (10) days of the filing of this Order.

(2) Plaintiffs' Renewed Motion to Compel Production of Documents and Answers to

Interrogatories Related to Jurisdiction (DE 122) be **DENIED AS MOOT**;

(3) Plaintiffs' Motion to Enlarge Pretrial Deadlines (DE 123) be **DENIED AS MOOT**; and

(4) All pretrial deadlines be **STAYED**.  The Court will issue a revised **SCHEDULING ORDER** as the need arises.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida, this 4th day of January, 2010.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

Copies to: Counsel of Record